979 A.2d 312

STATE v. LAVAR WINDER.

Argued March 9, 2009—Decided July 28, 2009.

232

234 

*John W. Douard,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Johanna Barba Jones,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

Defendant was charged with first-degree murder for the execution-style killing of a cab driver, to whom he apologized before shooting him point blank in the head. At trial, he advanced the affirmative defense of insanity. *See N.J.S.A.* 2C:4–1 ("A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong."). The key issue on appeal concerns the trial court's jury instruction on insanity.

The court gave the model charge on insanity despite defendant's request for a *Worlock*[1] variation on the charge, which he asserts would have explained to the jury that a criminally insane person may be capable of comprehending that an act is legally wrong while not understanding it to be morally wrong. Defendant claimed a belief that his parents were trying to kill him and that the only safe place for him was in prison. Although he knew killing to be wrong, defendant claimed not to know that it was morally wrong to have killed to get himself into the safety of jail. Hence he wanted the jury instruction to distinguish between legal and moral wrong. The trial court refused, determining that in

---

[1] *State v. Worlock,* 117 *N.J.* 596, 569 *A.2d* 1314 (1990).

this matter legal and moral wrong were coextensive, and the jury convicted defendant of first-degree murder. The Appellate Division found the trial court's jury charge to have been sufficient and affirmed defendant's conviction and sentence. We granted defendant's petition for certification, 196 *N.J.* 461, 957 *A.*2d 1170 (2008), and, because we reject defendant's interpretation of *Worlock's* import and application, we likewise conclude that the jury instruction in this matter was not legally insufficient. Finding no merit to defendant's other claims of error, we affirm the judgment of the Appellate Division.

## I.

On April 18, 2003, defendant Lavar Winder hailed a cab in Atlantic City, asked the cabdriver to take him to the police station, and, upon arrival, shot the cabdriver twice in the back of the head, killing him instantly. He was charged with first-degree murder, *N.J.S.A.* 2C:11–3(a)(1); second-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a); and third-degree unlawful possession of a handgun, *N.J.S.A.* 2C:39–5(b). Because defendant claimed that he was not guilty due to insanity, much of the trial focused on defendant's background.

At the time of the incident, defendant was twenty-five-years old. Although a high school graduate, he had an IQ in the low seventies, which constitutes borderline mental functioning. He lived in Philadelphia, Pennsylvania, where he had been employed by an armored car service in a position that legally authorized him to carry a gun. Defendant left the job in January 2003. Some time during the next month, he was shot in the groin, although the record is unclear as to the circumstances of that incident. Defendant provided various inconsistent explanations about it. What is clear is that defendant began exhibiting strange and paranoid behavior after the shooting incident. According to defendant's parents, who were divorced, and his ex-girlfriend Lillian Andrews, defendant would cry for no reason, talked to himself, and expressed the belief that people were trying to kill him. He

eventually came to believe that his parents had been responsible for the February 2003, shooting incident.

On April 16, 2003, defendant called his father complaining of bad headaches and his father took him to a local Philadelphia hospital. Doctors examined defendant, but they released him when they found no medical cause for the headaches. On leaving the hospital, defendant told his father that he did not want to return to his apartment because he did not feel safe there, so his father took him instead to a hotel. Later that night, defendant's father received a phone call from the police, explaining that defendant had been detained for causing a disturbance. He had been walking along a busy and dangerous roadway near the hotel, wildly swinging his arms. Defendant's parents immediately sought to have him involuntarily committed. While defendant's parents were en route with him to the hospital, defendant threatened to kill himself or someone else if he was not put in jail.

Defendant was admitted at a local hospital, where he tested positive for the controlled dangerous substance of phencyclidine (PCP). Doctors at the hospital diagnosed defendant with psychosis not otherwise specified (NOS) and possible PCP dependence. Defendant was released from involuntary commitment at the hospital on April 18, 2003.

When defendant's parents went to pick him up upon his discharge from the hospital on April 18, they had decided that it would be best for him to live with his mother in Virginia, where he could receive assistance for his mental health problems. Defendant thwarted that plan, however. As the three of them exited the hospital, he abruptly ran from his parents, jumped into his car, and drove away. He went to his apartment, retrieved his gun, and departed for Atlantic City. Defendant later explained that he chose Atlantic City because he believed that the jails in New Jersey were safer than those in Philadelphia.

When he arrived in Atlantic City, he drove around awhile as he contemplated killing someone. Defendant then left the city and, while driving on the Atlantic City Expressway toward Philadel-

phia, still trying to decide whether to kill someone, stopped at rest area and purchased a snack. After that, he turned back toward Atlantic City and returned to the downtown area. Once there, defendant parked his car, hailed a cab, and requested that the cabdriver take him to the police station. When the cab stopped outside of the police station, defendant pulled out his handgun, said to the driver, "I'm sorry I have to do this," and shot the driver twice in the back of the head, killing him.

Defendant got out of the cab, walked over to a uniformed police officer sitting in a nearby police car, and calmly announced, "Officer, I just shot someone in that cab over there." The officer confiscated defendant's weapon and placed him under arrest. Defendant was taken inside the station and placed in an interview room.

When officers entered the room to speak to him, defendant was crying and knocking his head against the wall. The officers read defendant his *Miranda*[2] rights and tape-recorded the confession that defendant gave. Defendant told the officers that he had to kill the cabdriver so he could go to prison for the rest of his life because prison was the only place where he would be safe. Defendant explained that he randomly chose the cabdriver as the victim, but added that he would not have killed a child and that he would not kill his parents.

The officers who had interviewed defendant testified that he did not appear to be under the influence of drugs or alcohol. When they asked him if he had consumed drugs or alcohol, defendant denied having had any alcohol but told them that he had taken medication earlier in the day.

At defendant's trial in January 2006, three mental health experts testified: Dr. Edward J. Dougherty, psychologist, and Dr. Kenneth J. Weiss, psychiatrist, for defendant; and Dr. Pogos Voskanian, psychiatrist, for the State. Defendant did not testify.

---

2 *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Having interviewed defendant and performed diagnostic testing, Dr. Dougherty testified that, in his professional opinion, defendant suffered from paranoid schizophrenia. Consequently, according to Dr. Dougherty, defendant heard and obeyed voices in his head that told him to kill someone. Dr. Dougherty further opined that defendant's PCP use would have only exacerbated his pre-existing mental condition. Dr. Dougherty ultimately concluded that defendant could not appreciate that what he was doing was wrong when he shot the cabdriver because he irrationally believed that it was the only way for him to get into jail, which he irrationally believed was the only place he would be safe.

Dr. Weiss had interviewed defendant twice and had reviewed all relevant records before testifying. Dr. Weiss agreed with Dr. Dougherty that defendant was suffering from schizophrenia, which led to defendant's actions. Dr. Weiss testified that defendant had been hearing voices before using PCP and, therefore, defendant's actions were caused by his mental illness rather than his drug use. Dr. Weiss explained that defendant knew that shooting the cabdriver "would give the impression that he needed to be locked up, but he did not know it was wrong because it was his intent to be safe so that he would preserve his own life." Dr. Weiss continued that, in his opinion, defendant "knew that if he killed someone, then he would be considered a bad person and that he would be locked up, so that he could then preserve his own life." Dr. Weiss ultimately said that defendant "might have had the capacity to say 'well, if people see me kill somebody, they'll surely lock me up.' That doesn't mean that he felt it was wrong in his case."

Dr. Voskanian, testifying for the State, had interviewed defendant twice and reviewed all pertinent records, and opined that defendant was not schizophrenic. Rather, Dr. Voskanian concluded that defendant's irrational thoughts were the result of his PCP use. Dr. Voskanian testified that he believed defendant "killed the cabdriver for his own idiosyncratic needs of going to jail, knowing that killing [the] cabdriver is [the] wrong thing to do. And he apologized to [the] cabdriver." Dr. Voskanian explained

that defendant's ability to appreciate the moral wrongfulness of his actions was demonstrated by his apology to the cabdriver and his statement that he would not have chosen a child-victim "because that's wrong," which led to his deliberate choice of an adult-victim.

During the charge conference, defense counsel requested an insanity instruction that included the definition of legal and moral wrong, citing *State v. Worlock*, 117 *N.J.* 596, 569 *A.*2d 1314 (1990). After considering that request, the court determined that a *Worlock* tailoring of the model charge was unnecessary because in the instant case legal and moral wrong were coextensive. Thus, the court instructed the jury with the model charge on insanity. *See Model Jury Charges (Criminal),* Insanity (October 1988).[3]

The jury found defendant guilty of first-degree murder, possession of a handgun for an unlawful purpose, and unlawful possession of a handgun. The trial court merged the charge for possession of a weapon for an unlawful purpose with the murder charge and sentenced defendant to fifty-five years' imprisonment with thirty years of parole ineligibility under the No Early Release Act (NERA), *N.J.S.A.* 2C:43-7.2. The court also sentenced defendant

---

[3] Because defendant's mental state was a hotly debated issue at trial and because there was some question whether defendant truly suffered from schizophrenia or if his delusions resulted from PCP use, much of the testimony at trial centered upon defendant's PCP use. Not only did the mental health experts testify about defendant's PCP use, but defense counsel also called defendant's ex-girlfriend Lillian Andrews as a witness, who testified, during cross-examination, that defendant used and sold illegal drugs while he was in high school. Moreover, defendant's father testified about defendant's drug use, explaining that defendant had tested positive for PCP and that three mental hospitals had blamed defendant's bizarre behavior on his use of the drug.

The court provided a limiting instruction after Andrews's statement, advising the jury to disregard testimony concerning any of defendant's prior crimes or bad acts. The court also provided a limiting instruction after each mental health expert testified, advising the jurors to consider the drug-use evidence solely as a basis for the experts' opinions regarding defendant's sanity at the time of the shooting. Finally, the court addressed the testimony regarding defendant's drug use during the jury charge by reminding the jurors that such testimony should only be considered for the limited purpose for which it was introduced.

to a concurrent three-year term of imprisonment for unlawful possession of a handgun.

Defendant's primary argument on appeal was that the jury charge on insanity was deficient because it did not distinguish between legal and moral wrong pursuant to *Worlock.* Defendant also asserted that the voir dire of prospective jurors was ineffective for failing to probe the jurors' views on the insanity defense; that defense counsel's performance constituted ineffective assistance of counsel; that the trial court's *N.J.R.E.* 404(b) limiting instructions were insufficient; and that his sentence was excessive. The Appellate Division affirmed the conviction and sentence, agreeing with the trial court's reasoning on each of the arguments raised by defendant.

On the insanity charge question, the panel agreed with the trial court that legal and moral wrong were coextensive in this case. The panel explained that there was no evidence demonstrating that defendant believed that his auditory hallucinations were "from God or from any authority higher than that which prescribes the laws of society." The panel rejected defendant's argument that this matter presented the type of insanity based on non-deific-specific delusions in *Worlock* (citing *Worlock, supra,* 117 *N.J.* at 611, 569 *A.*2d 1314).

We granted certification, 196 *N.J.* 461, 957 *A.*2d 1170, primarily to address defendant's argument that *Worlock's* reference, acknowledging the potential for a defendant not to know the difference between legal and moral wrong when laboring under a non-deific-originating delusion, warranted the giving of a jury charge distinguishing between "moral" and "legal" wrong in this matter.

## II.

### A.

In New Jersey, the test for criminal insanity is governed by statute. *N.J.S.A.* 2C:4-1 provides:

> A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong.

Enacted in 1978, as part of the *Code of Criminal Justice* (Code), *L.* 1978 *c.* 95, the statute was amended once solely to clarify that insanity constitutes an affirmative defense, *see L.* 1979 *c.* 178. As the "standard for determining criminal responsibility, the insanity defense draws on principles of moral blameworthiness." *Worlock, supra,* 117 *N.J.* at 602, 569 *A.2d* 1314. The test itself tracks back to our early common law adoption of the *M'Naghten*[4] test for insanity and criminal responsibility. *See State v. Spencer,* 21 *N.J.L.* 196, 201 (1846).

Prior to the enactment of the Code in New Jersey, the New Jersey Criminal Law Revision Commission (Commission) had recommended a move away from the well-established *M'Naghten* test, in favor of an alternative test for insanity contained in the Model Penal Code (MPC). 1 *Final Report of the New Jersey Criminal Law Revision Commission* § 2C:4–1, at 96 (1971). However, when New Jersey's Code was enacted, the Legislature declined to follow the Commission's recommendation and instead retained the *M'Naghten* test. *See* Senate Judiciary Committee Statement, S. 738 (introduced May 15, 1978) at 3. That the Legislature gave its stamp of approval to the continued application of the *M'Naghten* test in this state, as developed in our prior case law, provides the backdrop to our analysis of the divergence between legal and moral wrong that defendant argues required the giving of special instructions in his trial.

### B.

In *M'Naghten's Case, supra,* the defendant, a paranoid schizophrenic, suffered delusions of persecution and killed the secretary to the Prime Minister of England. The test, formulated by the judges of the Supreme Court of the Judicature in response to

---

4 *M'Naghten's Case,* 8 *Eng. Rep.* 718 (H.L. 1843).

questions posed by the House of Lords concerning when a defendant's mental state would excuse his actions, provided that

> to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.
>
> [8 *Eng. Rep.* at 722.]

What precisely was meant by the term "wrong" in *M'Naghten* was unclear and, ultimately, the upshot of the *M'Naghten* test was that, in some limited circumstances, a defendant could be excused because of his inability to recognize his actions as morally wrong, even though he may have understood them to be legally wrong. *See People v. Schmidt*, 216 *N.Y.* 324, 110 *N.E.* 945 (1915) (extending "wrong" to mean "moral wrong").

New Jersey embraced the *M'Naghten* test from its inception. *See Spencer, supra,* 21 *N.J.L.* at 201. In *Spencer,* the standard for determining a defendant's insanity was stated concisely:

> The simple question for you to decide .. is "whether the accused at the time of doing the act was conscious that it was an act which he ought not to do?" If he was conscious of this, he cannot be excused on the score of insanity—he is then amenable to the law.
>
> [*Ibid.*]

The explanation of the standard was less concise, but it was clearly and unequivocally tied to the *M'Naghten* test:

> As I said before, if the prisoner at the time of committing the act *was conscious that he ought not to do it,* the law holds him responsible, and he cannot be exculpated on the ground of insanity, although on some subjects he may have been insane at the time. There is many a man whose mind is not right on some subjects, who is nevertheless perfectly himself on all other subjects, and who knows as well as you or I what is right and wrong; and whether or not he would be doing right or wrong in lifting up a murderous hand against his neighbor. Several men of this kind have come under my own observation. One man will think himself made of glass, another will imagine himself to be a monarch or a prophet, or one of the heroes of history-another will be wild in some of his religious views; and yet each and all will know perfectly well that it would be wrong to kill a man out of revenge or provocation. *Whatever the insanity of a person* may amount to, if he is conscious at the time of committing an atrocious act, and has *reason* enough to know that he ought not to do it, he is guilty in the eye of the law. This was so expressly decided by all the judges of England, except one, in a late case in that country. (*M'Naghten's case.* 2 *Greenlf. Evid.* 301. *Note.*) The question was put

to them "What is the law respecting alleged crimes committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons, as, for instance, where at the time of the commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or avenging some supposed grievance or injury, or ,of producing some supposed public benefit?" To this question the Judges answered as follows:—"Assuming that the question is confined to those persons who labor under such partial delusions only, *and are not in other respects insane*, we are of opinion that notwithstanding the party accused did the act complained of with a view, under the influence of insane delusion, of redressing or avenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law." .. And the whole matter may be summed up in this: If the evidence makes it clear to your minds, beyond a reasonable doubt, that the prisoner at the time of the act, was unconscious that he ought not to do it, he is to be acquitted; but if not, then he cannot be acquitted on the ground of insanity, *whether he was partially insane or not.*

[*Id.* at 204–05].

We have followed the *M'Naghten* test consistently since its adoption in *Spencer*.[5] Immediately prior to its incorporation into the Code, our test for criminal responsibility was worded, like its statutory iteration, so as to hold that a defendant is not responsible for his or her acts if the person "was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong." *State v. Coleman*, 46 *N.J.* 16, 39, 214 *A.2d* 393 (1965); *see also State v. Sikora*, 44 *N.J.* 453, 470, 210 *A.2d* 193 (1965) ("Under the

---

[5] In *State v. Cordasco*, 2 *N.J.* 189, 196, 66 *A.2d* 27 (1949), we noted that Spencer's recitation and adoption of the *M'Naghten* test "ha[d] been cited, reaffirmed and followed many times" (citing *State v. Maioni*, 78 *N.J.L.* 339, 74 *A.* 526 (E. & A.1909); *State v. Kudzinowski*, 106 *N.J.L.* 155, 147 *A.* 453 (E. & A.1929); *State v. Close*, 106 *N.J.L.* 321, 148 *A.* 764 (E. & A.1929); *State v. George*, 108 *N.J.L.* 508, 158 *A.* 509 (E. & A.1931); *State v. Fine*, 110 *N.J.L.* 67, 164 *A.* 433 (E. & A.1932)). In 1945, the test was restated to require the accused to demonstrate, by a preponderance of the evidence, "that the extent and character of insanity which constitutes a defense against a criminal charge must be such as to render the accused incapable of distinguishing between right and wrong at the time of and with respect to the act committed." *State v. Molnar*, 133 *N.J.L.* 327, 331, 44 *A.2d* 197 (E. & A.1945).

*M'Naghten* concept, from which New Jersey has declined to depart (*State v. Lucas*, 30 *N.J.* 37, 72, 152 *A.*2d 50 (1959)), he who has the mental capacity to know the difference between right and wrong is legally responsible for his criminal conduct."); 2 *Final Report of the New Jersey Criminal Law Revision Commission*, commentary to § 2C:4–1, at 96 (1971).

The concept of requiring the defendant, who does know the nature and quality of his act, to be able to appreciate that what he was doing was *wrong* remains a central component of our test for criminal responsibility. *See State v. Breakiron*, 108 *N.J.* 591, 616, 532 *A.*2d 199 (1987); *see also Worlock, supra*, 117 *N.J.* at 606, 569 *A.*2d 1314 (perceiving no reason to construe "know" differently and more restrictively than "appreciate"). In *Spencer, supra*, the court recognized that "wrong" included "moral wrong," not just illegality, and instructed the jury:

if it is your opinion that at the time of committing the act [the defendant] was unconscious that he ought not to do it, or in other words, incapable of distinguishing right from wrong, *in a moral point of view*, then you have nothing further to do, but to render a verdict of acquittal on the score of insanity.

[21 *N.J.L.* at 201.]

In *State v. Carrigan*, 93 *N.J.L.* 268, 273, 108 *A.* 315 (E. & A.1919), the Court also highlighted the notion of "moral" wrong, explaining that a defendant charged with murder who pleads the insanity defense will be guilty "unless it appears that the [defendant] was not conscious, at the time of the killing, that the act which he was doing was morally wrong." (internal quotations and citations omitted). Thus, the notion of moral wrongness encompasses those who may not know all facets of the law but are sane enough to appreciate society's morals.

Our current Model Jury Charge for insanity reflects that a defendant, who knows the nature and quality of his or her criminal act must have had, at the time, the capacity to appreciate that the act was wrong:

[T]o establish insanity as a defense to the criminal charge in this case the defendant must prove, by a preponderance of the evidence, that defendant was laboring under such a defect of reason from disease of the mind as not to know the

nature and quality of the act, or if defendant did know it, that (he/she) did not know that what (he/she) was doing was wrong.

. . . .

The question is not whether the defendant, when (he/she) engaged in the deed, in fact actually thought or considered whether the act was right or wrong, but whether defendant had sufficient mind and understanding to have enabled (him/her) to comprehend that it was wrong if defendant had used (his/her) faculties for that purpose.

[*Model Jury Charge (Criminal)*, Insanity (October 1988).]

## C.

The preceding discussion leads to the most important prior decision for the instant case, *State v. Worlock*, 117 *N.J.* 596, 569 *A.*2d 1314 (1990). In *Worlock*, the issue was whether, when instructing a jury on insanity, a trial court is required in certain cases to further define the term, "wrong," to explain "moral wrong" as distinct from "illegal." *Id.* at 612, 569 *A.*2d 1314. In that case, the defendant shot and killed two of his friends after one of them stole his wallet containing a damaging photograph of the defendant. *Id.* at 599–600, 569 *A.*2d 1314. The defendant admitted that, at the time of the killings, he knew his actions were illegal and were wrong under societal morals. *Id.* at 614, 569 *A.*2d 1314. The defendant maintained, however, that the killings were justified based on his own personal code of morality. *Ibid.* Accordingly, the defendant argued that the trial court committed plain error by not instructing the jury that "wrong" encompasses knowing that an act is both legally and morally wrong and for not defining "moral wrong" for the jury. *Id.* at 612, 569 *A.*2d 1314.

Our decision emphasized that "[i]n most instances, legal wrong is coextensive with moral wrong," *id.* at 610, 569 *A.*2d 1314, and that that was particularly so in the case of murder, because anyone who knew the act to be contrary to law likely would have sufficient capacity to know it was also contrary to a basic moral principle of society, *id.* at 609–10, 569 *A.*2d 1314. Indeed, the affirmative defense of insanity ultimately depends on societal values in distinguishing, on moral blameworthiness grounds, "the sick from the bad." *Id.* at 602, 569 *A.*2d 1314 (internal quotations

omitted). Therefore, we were disinclined to agree that there is any general need separately to define moral wrong when instructing a jury:

> It may distort the analysis .. to focus on whether the wrong was legal or moral. In the vast majority of cases, if the defendant was capable of understanding that he was acting contrary to law, he would also have sufficient capacity to understand that he was acting contrary to the morals of society. Law is largely the crystallization of societal morals. Rarely would an allegedly illegal act not also be wrongful morally. Thus, "wrong" as used in the insanity defense will generally incorporate notions of both legal and moral wrong.

[Id. at 609–10, 569 A.2d 1314].

We acknowledged, however, that there could be circumstances in which, even for murder, legal and moral wrong would not be coextensive. *Id.* at 611, 569 A.2d 1314. We explained that because the insanity defense requires an inquiry into "the defendant's ability to comprehend whether his or her actions would ordinarily be disapproved by society, the concept of moral wrong must be judged by societal standards, not the personal standard of the individual defendant." *Id.* at 610, 569 A.2d 1314. That paramount concern—to ensure that the standard for judging moral wrong remained a non-subjective one—led to the conclusion that, "[a]s a general rule, it will not be sufficient ... that a defendant's personal moral code justified a killing otherwise prohibited by law and societal morals." *Ibid.* Several other jurisdictions had taken a similar approach.[6] *See ibid.* Our conclusion in

---

[6] Of particular note is *State v. Crenshaw*, 98 *Wash.*2d 789, 659 *P.*2d 488, 494–95 (1983), which excluded from the "sanctuary of the insanity defense" a killing done ostensibly to conform with the defendant's Moscovite beliefs that it was his duty to assassinate an unfaithful spouse. As the Washington Supreme Court explained, "[the defendant's] beliefs are irrelevant to the insanity defense, because they are not insane delusions. Some notion of morality, unrelated to a mental illness, which disagrees with the law and mores of our society is not an insane delusion." *Id.* at 495 (citing *State v. DiPaolo*, 34 *N.J.* 279, 293, 168 *A.*2d 401 (1961) (explaining difference between "an insane delusion which negates a consciousness of the immorality of the act from a moral depravity or some notion of morality, unrelated to mental illness, which merely disagrees with the law and *mores* of our society.")).

*Worlock* was aligned with those jurisdictions that took a non-subjective approach to the parameters of moral wrong in the rare instance in which legal and moral wrong are not coextensive.

In an effort to elucidate our position on when moral wrong might not be coextensive with legal wrong and generally accepted notions of society's mores, we hypothesized that a killing in obedience to a "command from God" served as an example of a situation in which society could recognize legal and moral wrong to be distinct. *Id.* at 611, 569 *A.*2d 1314. At the time, such an exception had been recognized in *Schmidt* and discussed in our earlier decision in *DiPaolo. Ibid.* Thus, the "command from God" scenario referenced in *Worlock* provided a convenient example because it was the "only generally-recognized" situation for when legal and moral wrong might not be coextensive in a murder case, although we noted that other "delusion-based exceptions" also might arise where legal and moral wrong were not coextensive.[7] *Ibid.*

Returning to the factual scenario present in *Worlock,* we concluded that it would be the exceptional case where legal and moral wrong might be objectively discernible, and accepted by society, as distinct. *Ibid.* Only such rare instances would justify an exception from the normal jury instruction that speaks of "wrong" in a manner that treats legal and moral wrong as coextensive. *Ibid.* Having decided that the defendant did not present one of those exceptional situations because his request was based on a subjective standard for moral wrong—his own idiosyncratic moral code—we held that the defendant was not entitled to such an exceptional instruction. *Id.* at 613–15, 569 *A.*2d 1314. "If the

---

A belief system contrary to the law and mores of society is not the equivalent of an insane delusion generated by mental illness that gives rise to legal insanity. *See DiPaolo, supra,* 34 *N.J.* at 293, 168 *A.*2d 401 (citing Justice, then Judge Cardozo, in *Schmidt, supra,* 110 *N.E.* at 949–50). It is the latter, not the former that may relieve a defendant of criminal liability.

[7] Because the facts of the case did not require it, we did not identify any other situations that might arise. *Ibid.*

insanity defense were so readily available [(as to incorporate a subjective standard of morality)], the life of each member of society would be imperiled by the whims of every other member." *Id.* at 614, 569 *A*.2d 1314.

## III.

■ Defendant asserts that this case presents one of the "other delusion-based exceptions" that we said in *Worlock* "conceivably might arise." *Id.* at 611, 569 *A*.2d 1314. It is true that defendant's alleged delusion—that jail was the only safe place for him because his parents were trying to kill him—was the hub of defendant's claim of insanity and his defense depended on the jury's belief of the testimony in support of that claim. However, defendant does not assert that his delusion commanded him to kill the cabdriver or that it would not be wrong to kill. Indeed, he demonstrated knowledge of the social unacceptance of his deed both by apologizing to his victim at the time of his anti-social act, and by consciously excluding children and his parents from his potential victims. This case does not present the type of command-type delusion that renders its hearer incapable of any appreciation of what society deems right from wrong. In our view, *Worlock* cracked open the door only to a command delusion that, objectively viewed, could have rendered it impossible for its hearer to know the difference between right and wrong.

Such delusions are, as one would hope, exceptional. In *Worlock* we recognized, as have decisions of other jurisdictions, that a psychotic deific-command delusion is capable of such confounding effect. *See, e.g., People v. Serravo,* 823 P.2d 128, 140 (Colo.1992) (en banc) (holding that defendant may be found legally insane if "[his] cognitive ability to distinguish right from wrong with respect to the act has been destroyed as a result of a psychotic delusion that God had decreed the act"); *State v. Cameron,* 100 *Wash.*2d 520, 674 *P*.2d 650, 654 (1983) (en banc) (holding that defendant was entitled to instruction allowing jury to consider deific decree theory). There is a paucity of other examples,

making the Tenth Circuit's observation of another possibility particularly noteworthy: "If [a] killer's mental illness caused him to believe that he had a warrant from the President or a command from God to kill the victim, he did not believe his deed was 'wrong' and the insanity defense is available." *Diestel v. Hines*, 506 *F.*3d 1249, 1272 (2007), *cert. denied*, —— U.S. —— 128 *S.Ct.* 2875, 171 *L.Ed.*2d 812 (2008).

Our reference to other delusion-based exceptions in *Worlock* was not meant to expand the narrow field of potential exceptions to the general understanding that legal and moral wrong, particularly in murder cases, are coextensive. The hurdle to overcoming societal disapproval of the killing of another human being cannot be accomplished easily by references to subjective beliefs, personal preferences, or even alternative notions of morality, unrelated to mental illness, that clash with the law and the mores of society. As Justice Pollock compellingly wrote in *Worlock*, *supra*, although

> defendant believed that under his own moral code he was justified in killing Abrahamsen and Marchyshyn, that belief does not nullify his appreciation that the killings were wrong according to law and the morals of society. Belief in an idiosyncratic code of morality does not constitute the defense of criminal insanity. If the insanity defense were so readily available, the life of each member of society would be imperiled by the whims of every other member.

[117 *N.J.* at 614, 569 *A.*2d 1314.]

Defendant was entitled to assert his claim of insanity, but he was not entitled to an instruction asking the jury to focus on legal versus moral wrong. He knew his act contravened the law because he labored under the delusional hope to become "safe" as a result of being jailed for it. That he had a personal motivation for his action, known to be contrary to law and society, does not entitle him to an instruction asking the jury to separate moral wrong in these circumstances. There is no credible claim of moral rightness that we discern in this matter. The law and society's mores are coextensive and, therefore, we conclude and hold that the trial court committed no error in denying defendant's request for a *Worlock* tailoring of the insanity charge to the jury.

To the extent that defendant asserts that *Worlock* meant that *any* delusion-based voices instructing or commanding a behavior would justify a specialized adjustment to the model charge on insanity, we disapprove of that interpretation. *Worlock's* dicta on delusional commands allowed for a specific distinction between legal and moral wrong in only the clearest and narrowest category of cases where a delusional command could be objectively recognized to confound the difference between lawful behavior and a moral imperative. Hence, courts have identified few examples as fitting the narrow class of cases contemplated (the few mentioned examples falling into such categories as God-like commands or presidential orders). *Worlock's* holding demonstrates that cases involving only an idiosyncratic, subjective sense that an action is morally correct do not constitute exceptions to the generally coextensive nature of legal and moral wrong in society so as to support being excused from criminal responsibility. The courts below correctly discerned the difference between this matter and the type of case for which an allowance was recognized in *Worlock*. We affirm the judgment of the Appellate Division that there was no error in the form of the jury instruction on insanity delivered in this matter.

## IV.

Defendant raises several additional claims of error in his trial proceedings. We address each in turn.

### A.

First, defendant argues that the voir dire of the jury was deficient because neither the trial court nor defense counsel probed the prospective jurors' views about the propriety of an insanity defense or their prejudices concerning mental illness.

In furtherance of protecting a defendant's right to a fair trial, a trial court must "probe the minds of the prospective jurors to ascertain whether they hold biases that would interfere with

their ability to decide the case fairly and impartially." *State v. Erazo*, 126 *N.J.* 112, 129, 594 *A.2d* 232 (1991). That said, trial courts must be allotted reasonable latitude when conducting voir dire and, therefore, a reviewing court's examination should focus only on determining whether "the overall scope and quality of the *voir dire* was sufficiently thorough and probing to assure the selection of an impartial jury." *State v. Biegenwald*, 106 *N.J.* 13, 29, 524 *A.2d* 130 (1987). Generally, a trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury. *See State v. Tinnes*, 379 *N.J.Super.*, 179, 184, 877 *A.2d* 313 (App.Div.2005).

We addressed the adequacy of a voir dire in a case involving an insanity defense in *State v. Moore*, 122 *N.J.* 420, 585 *A.2d* 864 (1991). Recognizing that "many laypersons have a great deal of difficulty in understating the insanity defense, and many people might not be able to consider it as a viable defense," *id.* at 453–54, 585 *A.2d* 864, we instructed courts to "screen out prospective jurors who could not consider an insanity defense due to their prejudices or biases against it," *id.* at 454, 585 *A.2d* 864. In such cases, we advised courts to ask "whether a juror can judge the testimony of psychiatric witnesses by the same standard that he or she would apply to the testimony of any other witness." *Ibid.*; *see also State v. Murray*, 240 *N.J.Super.* 378, 392, 573 *A.2d* 488 (App.Div.), *certif. denied*, 122 *N.J.* 334, 585 *A.2d* 350 (1990) (holding that, in context of insanity defense, "[a] judge's refusal to interrogate jurors on a particular form of prejudice does not necessarily constitute reversible error").

Defendant did not object to the court's voir dire. Therefore the plain error standard applies. *See State v. Torres*, 183 *N.J.* 554, 564, 874 *A.2d* 1084 (2005); *R.* 2:10–2. Defendant must establish that there was an error "clearly capable of producing an unjust result." *State v. Burns*, 192 *N.J.* 312, 341, 929 *A.2d* 1041 (2007); *R.* 2:10–2.

In this matter, as in *Murray*, the trial court asked the prospective jurors if they had: "any experience with psychiatry or psychology"; "ever studied [ ] psychiatry or psychology"; or "heard or read anything about the use of psychologists or psychiatrists, during the course of a criminal trial, that would affect in any way [their] ability to judge such testimony fairly and just like anybody else's testimony." The trial court also asked the prospective jurors whether they would "automatically reject psychiatric or psychological opinion testimony, simply because experts may give conflicting testimony." That questioning satisfied the standard established in *Moore* and *Murray*. The trial court asked questions nearly identical to those determined to be acceptable in *Murray, supra*, 240 *N.J.Super.* at 392, 573 *A.2d* 488. And, the court's questioning was consistent with our exhortations in *Moore, supra*, 122 *N.J.* at 453–54, 585 *A.2d* 864, because the questions probed the jurors' ability fairly to assess the testimony of psychiatric and psychological witnesses.

Defendant points to no specific, essential question that was not sufficiently explored through the court's voir dire. We find no abuse of discretion in the thoroughness of the trial court's voir dire. We therefore reject, as did the Appellate Division, this claim of error.

### B.

■ Second, defendant claims ineffective assistance of counsel for three reasons: defense counsel failed to request an insanity instruction that distinguished between legal and moral wrong early enough during the trial; counsel failed to voir dire prospective jurors to uncover bias toward the insanity defense and the mentally ill; and defense counsel misstated the insanity defense burden of proof three times during his summation. To demonstrate a claim for ineffective assistance of counsel, defendant must show that (1) counsel's representation was deficient and that (2) the deficiencies materially prejudiced the outcome. *See Strickland v. Washington*, 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80

*L.Ed.*2d 674, 693 (1984); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987).

Defendant's argument that defense counsel was deficient for failing to request an insanity instruction that distinguished between legal and moral wrong early enough during the trial is baseless. As we have already determined, an instruction that distinguished between legal and moral wrong was not warranted in this case. Accordingly, the failure to request that charge, at whatever stage in the proceedings, was not deficient. In any event, counsel's request for the charge at the conclusion of the proceedings was proper. *See R.* 1:8–7(b).

As for defendant's claim of ineffective assistance of counsel based on the failure to object to the court's voir dire, we can dispense with that argument with dispatch. Even if we were to assume that a deficiency existed in counsel's performance (which we do not find), for the reasons already expressed we have concluded that the trial court's voir dire was proper and sufficiently thorough. Therefore defendant cannot claim any prejudice from this alleged deficiency.

Finally, defendant also claims that counsel's performance was deficient because he misstated the insanity defense burden of proof three times during his summation. That argument is similarly without merit. Despite defense counsel's three misstatements, counsel correctly stated the burden of proof several other times during his summation. The trial court also correctly instructed the jury that defendant bore the burden of proving his insanity defense and that its legal instructions were to take precedence over the attorneys' comments on the law. Finally, in connection with our review of this claim, we note that defense counsel's misstatement would only have aided defendant's case, had the jury actually been confused about the burden of proof. In sum, although defense counsel misspoke on the insanity defense burden of proof, the misstatements during summation did not constitute a deficient performance for purposes of ineffective

assistance of counsel and, moreover, defendant cannot claim to have been materially prejudiced by the misstatements.

c.

Defendant further argues that the trial court's limiting instructions regarding his past drug use were deficient and that the admission of testimony that he dealt drugs in the past deprived him of a fair trial.

Evidence of other crimes or wrongs is not admissible to "prove the disposition of a person in order to show that such person acted in conformity therewith." *N.J.R.E.* 404(b). *Evidence Rule* 404(b), however, sets forth the exceptions to the admissibility of "other crimes, wrongs, or acts":

> Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [*Ibid.*]

When other-crimes evidence is admitted pursuant to *Rule* 404(b), the jury must be instructed as to the permissible use of such evidence and its limited relevance. *State v. Stevens,* 115 *N.J.*, 289, 304, 558 *A.*2d 833 (1989). Such instructions "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." *Ibid.*

Defendant's use of illegal drugs was a central theme throughout trial. Defense counsel first called defendant's girlfriend, Andrews, as a witness after acknowledging that "some of her testimony[ ] [was] going to hurt [defendant]." On cross-examination, Andrews testified that defendant used and sold illegal drugs while he was in high school. Defense counsel objected to that testimony, and a lengthy sidebar immediately followed, concluding with the trial court instructing the jury to disregard

Andrews's testimony concerning any of defendant's prior crimes or bad acts. The court specifically told the jury not to use the testimony "to form some kind of an opinion" that defendant was a "bad person" and that he therefore was guilty of the crimes charged. Counsel did not object to the limiting instruction, and the issue of defendant's drug-dealing never came up again.

We find that the trial court adequately addressed Andrews's testimony regarding defendant's drug-dealing. The testimony about defendant's prior drug-dealing was not admissible for any permitted purpose under *Rule* 404(b). The court's prompt limiting instruction properly directed the jury to disregard the testimony. The instruction to the jury came immediately after it heard the testimony (and the sidebar that ensued after counsel's objection). Thus, although the court referred to it as testimony about defendant's prior crimes or bad acts, the limiting instruction was, in our view, sufficiently clear as to its subject and unequivocal in its direction. Had the court's reference to the testimony been more specific it only would have further emphasized to the jury defendant's prior drug-dealing activity. Defendant's claim that, notwithstanding the limiting instruction, the testimony had a "devastating prejudicial impact" lacks merit. We presume that the jury followed the instruction accurately. *State v. Manley*, 54 *N.J.* 259, 271, 255 *A.*2d 193 (1969).

Defendant's father also testified about defendant's illegal drug use. He stated that defendant had tested positive for PCP and that three mental hospitals had blamed defendant's behavior on his use of the drug. Counsel did not request a limiting instruction after that testimony, and none was given.

Both defendant's and the State's experts testified about defendant's illegal drug use in the context of his mental state at the time of the shooting. Although not requested by defense counsel, the trial court provided an extensive *Rule* 404(b) limiting instruction following each expert's testimony. The court told the jurors that they were to consider the evidence solely as a basis for the experts' opinions regarding defendant's sanity at the time of

the shooting. The court specifically prohibited the jury from considering the testimony of past drug use as propensity evidence. Moreover, the trial court again addressed the issue of defendant's drug use during its final charge to the jury, explaining that the evidence on drug use was introduced for a limited purpose, and the jury should consider it only for that limited purpose.

We conclude that the trial court properly addressed the experts' testimony regarding illegal drug use, and that no plain error occurred. Defendant concedes that testimony presented by the experts concerning his drug use was relevant in establishing that PCP did not cause his psychosis. Furthermore, the trial court's extensive limiting instructions, to which defense counsel did not object, repeatedly explained to the jury the purpose for which it was to consider the testimony, namely, to determine defendant's state of mind at the time of the shooting. The instructions also told the jury not to consider the testimony as evidence of defendant's bad character or guilt. *See State v. Oliver,* 133 *N.J.* 141, 158–59, 627 *A.2d* 144 (1993).

Moreover, we note that, during summation, defense counsel referred to the testimony about defendant's illegal drug use in two ways. Counsel argued that defendant used PCP to self-medicate in an effort to treat his hallucinations and delusions. Counsel also argued that if the jury believed that defendant was intoxicated from the ingestion of PCP, then they should convict him of manslaughter, rather than murder. It is readily apparent that defendant's argument that the introduction of that evidence was prejudicial and caused an unjust result is unfounded. We therefore reject this claim of error advanced by defendant.[8]

---

[8] We also reject defendant's additional, and final, claim of excessive sentence. The court's findings regarding aggravating and mitigating factors were supported by competent credible evidence in the record. The trial court sentenced defendant to fifty-five years' imprisonment for murder, and to three years to run concurrently for the unlawful-possession-of-a-handgun charge. Pursuant to NERA, defendant is subject to a thirty-year period of parole ineligibility. The

## V.

For the reasons expressed herein, we affirm the judgment of the Appellate Division upholding defendant's conviction and sentence.

Justice LONG, concurring.

As used in the insanity defense, the word "wrong" has both legal and moral connotations. *See State v. Spencer*, 21 *N.J.L.* 196, 201 (1846). Generally, those connotations are coextensive. *State v. Worlock*, 117 *N.J.* 596, 609–10, 569 *A.2d* 1314 (1990) ("In the vast majority of cases, if the defendant was capable of understanding that he was acting contrary to law, he would also have sufficient capacity to understand that he was acting contrary to the morals of society."). Occasionally, however, the notions of legality and morality may diverge, as in the case of a defendant who knows his acts are unlawful but lacks the ability to comprehend that they are morally wrong. *Id.* at 611, 569 *A.2d* 1314. Thus, for example, an insane delusion in the nature of a command hallucination has been recognized as bearing on the issue of a defendant's capacity to understand the moral wrongness of his conduct. *Ibid.* (citing *People v. Schmidt*, 216 *N.Y.* 324, 110 *N.E.* 945, 949 (1915)). To the contrary, a defendant's personal moral code is not the equivalent of an insane delusion that could give rise to the operation of the legal-moral distinction. *State v. DiPaolo*, 34 *N.J.* 279, 293, 168 *A.2d* 401, *cert. denied*, 368 *U.S.* 880, 82 *S.Ct.* 130, 7 *L.Ed.2d* 80 (1961). In respect of all of the foregoing principles, I am in complete accord with the majority's view.

I part company from my colleagues insofar as their opinion can be read to suggest that a trial judge should instruct the jury regarding the moral-legal dichotomy only when the evidence adduced falls into the "narrowest category" of a deific or similar command. *Ante* at 251, 979 *A.2d* 324. To be sure, such commands

---

sentence does not "shock the judicial conscience." *State v. Roth*, 95 *N.J.* 334, 365, 471 *A.2d* 370 (1984).

implicate the question of moral culpability. However, in my view, there should be no limitation on the type of command hallucination that would trigger an explanation of moral as opposed to legal responsibility. Given the vagaries and idiosyncrasies of mental disease, a mentally ill defendant should have the opportunity to establish that he, in fact, experienced a delusional command hallucination that rendered him incapable of knowing that what he was doing was morally wrong, regardless of the nature of the delusion.

For me, it makes no difference whether the mentally ill defendant claims he was commanded to kill by God, the President, the Pope, or a rock star. The issue is one for the jury, which must decide whether, laboring under his particular mental defect, the defendant had sufficient understanding to have enabled him to comprehend that his act was morally wrong. Thus, I would make no distinction between the types of command hallucinations that would trigger a *Worlock* charge, but would focus the jury instead on the defendant's mental disease and on the question of what effect the hallucination had, regardless of its nature, on his ability to comprehend the morality of his act.

Thus, in any case in which the defendant claims that, as a result of an insane delusion, he did not have the capacity to tell that his acts were wrong, I would hold that the jury should be instructed in accordance with *Worlock*, without regard to the nature of the claimed command hallucination. Under that paradigm, it should fall to a properly instructed jury to decide, without interference from the trial judge, whether, in light of the defendant's mental disease or defect, an insane delusion rendered him incapable of knowing his act was morally wrong. I would modify the model jury instruction on insanity accordingly. *See Model Jury Charges (Criminal)*, Insanity (October 1988).

Despite my view of the rule that should apply going forward, I am satisfied that in this case the absence of a *Worlock* charge did not affect the outcome or deny defendant a fair trial. I therefore concur in the result reached by the Court.

Justice ALBIN joins in this opinion.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.