# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5096-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

R.B.,[1]

     Defendant-Appellant.

_____

Argued February 10, 2021 – Decided May 28, 2021

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 00-12-1538.

Arthur L. Aidala argued the cause for appellant (Aidala, Bertuna & Kamins, P.C., attorney; Arthur L. Aidala, on the briefs).

Daniel Finkelstein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Daniel Finkelstein, of counsel and on the brief).

---

[1] We use initials to protect the identity of the victim. R. 1:38-3(c)(12).

PER CURIAM

Defendant R.B. appeals from a June 17, 2019 judgment of conviction after a jury found him guilty of second-degree sexual assault, N.J.S.A. 2C:14-2(c), third-degree criminal restraint, N.J.S.A. 2C:13-2, and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d).[2]  Having carefully reviewed the record, and in light of the applicable law, we affirm defendant's convictions but remand the matter for re-sentencing.

On appeal, defendant raises the following arguments for our consideration:

> POINT I
>
> THE DEFENDANT WAS DENIED DUE PROCESS UNDER THE STATE AND FEDERAL CONSTITUTIONS WHEN THE TRIAL COURT FAILED TO CONDUCT A VOIR DIRE THAT, UNDER THE CIRCUMSTANCES, ADEQUATELY QUESTIONED PROSPECTIVE JURORS ON ISSUES OF RELIGION, ETHNIC[,] AND CULTURAL BIAS.
>
> > A.  Voir dire must assure the selection of a fair and impartial jury.
> >
> > B.  Voir dire was inadequate resulting in the failure to ensure the selection of a fair and unbiased jury.

---

[2]  Defendant was also convicted of false imprisonment, N.J.S.A. 2C:13-3, the lesser included offense of criminal restraint.

C. Standard of review.

D. The failure to adequately probe for juror bias resulted in plain error.

POINT II

[J.H.'S] CUMULATIVE[,] UNSOLICITED[,] AND INADMISSIBLE TESTIMONY REGARDING [DEFENDANT'S] CULTURE, RELIGION, AND ETHNICITY, UNFAIRLY PREJUDICED HIM. NO CURATIVE INSTRUCTION COULD REMEDY THE PREJUDICE.

A. [J.H.'s] repeated prejudicial statements as to [defendant's] culture, religion, and nationality.

B. It was plain error for the witness to make irrelevant and prejudicial statements to establish her credibility.

C. The cumulative effect of [J.H.'s] prejudicial statements denied [defendant] a fair trial.

D. The convictions should be remanded.

POINT III

A NEW TRIAL SHOULD BE ORDERED AS THE VERDICT WAS THE RESULT OF A MISCARRIAGE OF JUSTICE.

A. [J.H.'s] testimony was wholly lacking in credibility and was insufficient to convict the defendant of any crime.

3

POINT IV

[DEFENDANT'S] WARRANT STATUS WAS UNFAIRLY CONSIDERED BY THE SENTENCING COURT RESULTING IN AN EXCESSIVELY HARSH SENTENCE.

A.  Standard of Review for Sentencing

We discern the following facts from the record.  In 1998, defendant and J.H. met through work and began dating.  In April 1999, defendant and J.H. were married.  Around 10 p.m. on March 26, 2000, defendant and J.H. were alone in her home.  While the two were in the basement, J.H. told him that she was "glad" to have her "house back for the night."  Defendant then "flipped out," grabbed her by the throat, and pinned her on the couch.  He then carried her to the upstairs bedroom and threw her on the bed.  Defendant stated that he was "really going to hurt" her.  He demanded J.H. take her clothes off; she complied because she "was terrified of him."  Meanwhile, defendant reached under the bed and retrieved a sword.[3]

While defendant was dragging the sword along her body, he told her that he was going to "use [it] on" her and that he had to "hurt" her.  Defendant placed the sword to J.H.'s neck and then "poked . . . a hole in one of the [pillowcases]."

---

[3]  The sword was not produced at trial and it is unclear from the record what happened to it.

A-5096-18

He then told her that he wanted to have sex. J.H. complied because she was "scared to death" and afraid that if she did not, the "other options would have been much worse." While defendant was on top of her, J.H. felt numb as she cried for him to stop. The next morning, J.H. did not inform the police or her friends about the incident with defendant because she "was terrified of him."

On September 6, 2000, J.H. was in her basement with defendant, his brothers, and several of his friends. While they were watching a movie, defendant instructed J.H. to make him food. When she refused, defendant became enraged and ordered her to go to the bedroom. J.H. followed him to the bedroom because she was "scared for [her] life." When they got to the bedroom, defendant started slapping her in the face. Defendant then instructed J.H. to serve him a meal in the basement, which she did. Defendant subsequently directed J.H. upstairs at which point he started hitting her in the face and legs. This incident lasted "for hours," and J.H. was struck "a number of times." J.H. did not seek medical attention or contact the police after this incident.

On September 8, 2000, J.H. informed her neighbor, Linda, about these incidents. Linda persuaded J.H. to stay at her home for the night because she was frightened for her, and the two concocted a story to tell defendant to allow her to stay. Around midnight, J.H., Linda, and Linda's daughter went over to

5

J.H.'s home to retrieve several toiletries. While inside the house, Linda observed the sword leaning up against the wall in the basement. Around 2 a.m., defendant called Linda's home and asked J.H. to come home. After J.H. refused, he called several more times before he showed up at Linda's home. While defendant, Linda, and J.H. were talking, Linda observed bruises on J.H.'s legs. Following the conversation, J.H. went back to her home with defendant.

The next day, Linda went over to J.H.'s house to take her to the police. J.H. wanted to shower, so Linda waited in the living room until she was ready. J.H. had locked the bedroom door, but defendant picked the lock with a knife and relocked it behind him. At this point, J.H. was already dressed, but defendant ordered her to shower again with him. After J.H. refused, she became worried and shouted for Linda's help. Linda went to the bedroom door and yelled to defendant to let her in. After several requests to open the door, Linda eventually broke it open and observed that defendant had his arm on her elbow. J.H. and Linda left the house and went to the police station.

Following a four-day jury trial,[4] defendant was convicted of sexual assault, criminal restraint, and unlawful possession of a weapon. Before

---

[4] Defendant filed a motion for a new trial and a motion for a judgment of acquittal, both of which were denied.

defendant's sentencing date, however, he absconded and was not located until December 6, 2018. At sentencing, the judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (risk that . . . defendant will commit another offense), applied because of defendant's "extended absconding" as well as his "contempt" and "disregard[]" of the court. The judge also determined aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (need to deter "defendant and others from violating the law"), applied "in light of the seriousness of the offense." The court found mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) (lack of prior criminal activity), and eight, N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur). The judge rejected defendant's argument that mitigating factors nine, N.J.S.A. 2C:44-1(b)(9) ("character and attitude of . . . defendant indicate that he is unlikely to commit another offense"), and ten, N.J.S.A. 2C:44-1(b)(10) ("defendant is particularly likely to respond . . . to probation"), applied due to "the extended period that [defendant] absconded for." After concluding the aggravating factors outweighed the mitigating factors, the judge sentenced defendant to seven years' imprisonment on the

sexual assault conviction and concurrent sentences on the remaining convictions.[5]

We reject defendant's argument that the trial judge did not adequately question prospective jurors on issues relating to defendant's Pakistani heritage. In our review of decisions relating to the jury, we are mindful that "[a] defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187 (2007). We leave the selection and management of the jury, however, to the sound discretion of the trial judge. State v. Brown, 442 N.J. Super. 154, 182 (App. Div. 2015). In the selection of a jury, "trial [judges] must be allotted reasonable latitude when conducting voir dire and, therefore, a reviewing court's examination should focus only on determining whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'" State v. Winder, 200 N.J. 231, 252 (2009) (quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)).

---

[5] Defendant received a four-year term for criminal restraint, a one-year term for unlawful possession of a weapon, and a six-month term for false imprisonment.

In this case, defense counsel requested a special interrogatory to the jury relating to defendant's Pakistani heritage, which request the trial judge granted. The judge then questioned the jury as follows:

> Now, I tried to be as straightforward as I can. Sometimes I'm a little too blunt, but [defendant] is a Pakistani national. And a Pakistani national, you know, a lot of it is talked about, is Pakistanis in the news, things like that. He is a Pakistani national.
>
> That is not an issue in the case. Any of you, how do you feel about that? This create[s] any issues with you? Anything? Be honest.
>
> Anybody feel that that is going to enter into their thoughts at all?
>
> It is not at all in this case.
>
> If it will, I'll excuse you with no questions asked. Okay.
>
> If any of you feel that [defendant's] nationality is going to influence your decision one way or the other, I really don't want you on the case.
>
> If it is hard for you to raise your hand, if any of you feel before this jury is selected that it is going to be an issue for you, it is your obligation to come up [–] raise your hand and come up here and tell me at side bar that's going to be a problem.

We are satisfied that this instruction was more than adequate to address defendant's concerns. Indeed, the effectiveness of the voir dire is evidenced by

9

the fact that after hearing the judge's instruction, one prospective juror was removed for cause because she indicated that she could not be impartial due to her Indian heritage.

Moreover, the judge's failure to explicitly mention the September 11th terrorist attacks did not "undermine[] the selection of an impartial jury." Winder, 200 N.J. at 252. The charges leveled against defendant at trial related to domestic violence and did not involve terrorism. Therefore, the absence of an explicit reference to the September 11th attacks was not an abuse of discretion. See United States v. Adedoyin, 369 F.3d 337, 342 (3d Cir. 2004) (holding the defendant, a Nigerian national charged with mail and wire fraud, "could receive a fair trial in the wake of" the September 11th attacks because, among other things, his case did not involve terrorism).

We also reject defendant's contention that J.H.'s testimony relating to his culture, ethnicity, and religion was unduly prejudicial and "capable of producing an unjust result." R. 2:10-2. Defendant now takes issue with several of J.H.'s comments including:

> [Q:] Was there any particular reason why that's how you got married?
>
> [A:] Yes, there was a good reason for that. I really cared about him and he, he told me that he was going

to need to leave the country and he needed a way to stay
. . . but I would have done anything to help him.

      . . . .

[Q:] Once the two of you were married, did [defendant] move in with you?

[A:]  Yes, he did.

      At first he said, well, this is going to be a hard transition for you to meet my family because they come from a strict Pakistani Islamic culture.  Men and women don't mix, and the concept of dating to know someone prior to marriage, it's forbidden.  You are arranged with a person based on a screening and you marry, that's it, and the whole . . . idea of bringing an American into his family, he explained to me there needed to be more of a transition period.

Defendant also claims the following testimony was unduly prejudicial:

[A:]  So, I had no support.  He was constantly making deals, bringing people in to work in my home.  They were all Pakistani, at that point Pakistani, Muslim, completely different customs than I have.  They pray five times a day.  Completely different culture, completely different viewpoint, attitude towards women and the amount of freedom we are allowed to have in our daily life.  They were all on his side.

      . . . .

[Q:]  Were you able to talk to them the next day at all?

[A:]  There was no way, the way they would talk about women, it wasn't like, it's not like American culture we

11

are talking about. It's not where men and women are friends. Men and women are separate.

When I visited his home, January of 2000 was the first time, I spent New Year's at his home. I met his mother, and I had, he had begun to, we had gone to several family functions, birthdays, things like that at his house, and you have to understand men and women are separate and they are different and they are not equal.

When I went in the women would cook, the women would do everything and the men would sit in the better room with the better couch and the better television set, watch [television] and the women would bring them whatever they wanted[,] and the women got to sit in the back bedroom. His mother and sister share a bedroom. The mattress is on the floor, and the women had to sit on the floor.

Likewise, defendant further contends the following comments were similarly damaging:

[Q:] Now, who was living at your home, if you can recall, on that date, on September 6 of 2000?

[A:] Well, myself, [defendant], his brother Shehnaam, his brother Naveed, another person named Sajoffa and there's three more, these are all Arabic names, so it's hard to recall. Eight people in total, including [defendant] and myself.

. . . .

[Q:] Did you do anything to get their attention?

12

[A:] No, no, there was, these were [defendant's] family and strict Muslim people who were on his side and there was nothing I could have done, they just didn't, no, there was nothing, and with them and the culture if a woman objects to a relationship or something, it's like, oh, that's the woman's fault, she's crazy she's making this up, she's just crying to discount it, because a woman's viewpoint doesn't count.

Finally, defendant avers that the J.H.'s reference to "alien paperwork" adversely affected his case.

Defense counsel's failure to interpose a timely objection undercuts the argument on appeal that the remarks were unduly prejudicial. See State v. Timmendequas, 161 N.J. 515, 576 (1999) ("Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made." (citing State v. Irving, 114 N.J. 427, 444 (1989))). In any event, the trial judge gave a complete and adequate instruction at the end of trial:

Members of the jury, during the trial you heard comments from [J.H.] regarding [defendant's] nationality, his religion, his background. These comments, as I ruled at the time, were basically irrelevant to the issues in this case.

There's no place in this trial for gratuitous references to race, religion or nationality.

You all promised during the jury selection process that the fact that [defendant] is a Pakistani national would not have an affect on you. Therefore, I

13

> charge you that you are not to consider his race, his nationality or his religion in arriving at your verdict.

"We presume the jury followed the court's instructions," State v. Smith, 212 N.J. 365, 409 (2012) (citing State v. Loftin, 146 N.J. 295, 390 (1996)), and find no plain error in the elicitation of these fleeting comments.[6]

Turning to defendant's argument concerning his sentence, we conclude that the judge placed an inordinate amount of weight on the fact that defendant absconded after trial but prior to sentencing. A "sentence based upon a factor which is unrelated to the sentencing criteria set forth in the Code of Criminal Justice" is an illegal sentence. State v. Wilson, 206 N.J. Super. 182, 184 (App. Div. 1985) (citing N.J.S.A. 2C:1-1 to 104-9). "Nowhere in the code is it suggested that defendant's appearance for sentence is one of those criteria." Ibid. (citing State v. Roth, 95 N.J. 334 (1984); State v. Hodge, 95 N.J. 369 (1984)). Defendant's reasons for failing to appear "must . . . be relevant to identified sentencing guidelines" if they are to be considered. Ibid. It is clear that a "sentence based entirely upon nonappearance is an illegal sentence." Ibid.

Here, the judge commented that defendant's failure to appear weighed "heavily" on his decision. Notwithstanding that this was defendant's first

---

[6] We also note that these comments placed J.H.'s silence or failure to complain about defendant's conduct into context and, in that regard, were relevant to her credibility.

offense and he committed no subsequent crimes, the judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), due to his failure to appear. The judge also summarily rejected applying mitigating factors nine and ten because of "the extended period that [defendant] absconded for." Because the judge analyzed the applicability of the aggravating and mitigating factors almost entirely with reference to defendant's long-term non-appearance, we are constrained to remand the matter for re-sentencing.

Affirmed in part; remanded for re-sentencing consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5096-18