STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
HENRY CAMPBELL CLOSE, ALIAS H. COLIN CAMP-
BELL, ALIAS RICHARD M. CAMPBELL, ALIAS RICHARD
MORTON CAMPBELL, PLAINTIFF IN ERROR.

Argued October 16, 1929—Decided February 3, 1930.

For the plaintiff in error, *Francis A. Gordon*.

For the defendant in error, *Abe J. David,* prosecutor, and *Walter C. Tenney,* assistant prosecutor of the pleas.

The opinion of the court was delivered by

WALKER, CHANCELLOR. The plaintiff in error was convicted in the Union Oyer and Terminer of murder in the first degree without recommendation, and sentenced to death. He brings error into this court and removes here the entire record of proceedings had upon the trial of the cause, together with the bill of exceptions signed and sealed.

The brief on behalf of the defendant in error starts with the assertion that "the facts in the case are set forth in the brief filed on behalf of the plaintiff in error in this cause under the headings of Facts and Defenses, and the state does not deem it necessary to repeat those facts in this brief."

This, in effect, is a statement that the facts as set forth in the brief of the plaintiff in error are true. And what the parties state as the facts of the case the court is willing to accept. Taken from the brief of the plaintiff in error they are as follows:

"FACTS.

"Henry Colin Campbell, aged sixty-one, married, and the father of three children, was indicted May 14th, 1929, for

the murder of Mildred Mowry [also known as Parmelia Elizabeth Mowry]. On February 23d, 1929, about five-thirty A. M., a woman's body was found in flames on a public highway known as Springfield avenue, Cranford, New Jersey. In April, 1929, the body was identified as that of a Mrs. Benjamin Mowry, age about fifty-nine, a nurse of Greenville, Pennsylvania, who had been married to Campbell August 28th, 1928. April 11th, 1929, Campbell signed a typed statement at the Union county prosecutor's office, wherein he admitted shooting Mrs. Mowry in the head and then pouring gasoline over her and setting her on fire. The statement contained the following:

"There was nothing between us that prompted me to do this except for the reason that I could not maintain two establishments.

"I did not intend to marry this woman originally, but I married her thinking it might relieve me of some of my financial difficulties. I had been in financial difficulties for the past two years or more."

It should be remarked that the statement concludes:

"I am making this statement voluntarily and freely and without any promises of any kind or any threats.

HENRY COLIN CAMPBELL."

Campbell is the name he certified was his; he so signed the statement and is called by that name throughout the case.

Evidence was offered for the defense, and witnesses for the state were cross-examined in an effort to establish the mental state of the accused at the time of the shooting to prove that the homicide lacked premeditation and deliberation, and therefore the crime was not above second degree murder. Insanity was not the defense.

Counsel for the plaintiff in error in his brief says that assuming the defendant entertained in his mind a design to kill, the manner of the execution dispels the conclusion that the intent ripened into design as the result of deliberation. There is no dispute but that the statement, which was a confession, was voluntary, the argument being that even it did

not show a design on the part of the defendant to kill the deceased.

The jury had before them all the facts, including the statement, and their judgment in finding the defendant guilty of murder in the first degree was that he did kill and murder the deceased with willfulness, deliberation and premeditation. The statement itself sufficiently indicates it, and that, read in connection with all of the testimony in the case, overwhelmingly proves it; and that beyond any reasonable doubt.

The plaintiff in error files thirty-two assignments of error and thirty-two causes for reversal, the latter being an exact duplication of the former; and argues them under the following heads: (1) The entire evidence showed lack of premeditation and deliberation; which is subdivided into (a) worry, (b) drugs, (c) bodily disease, (d) want of sleep and rest; (2) As to the crime itself; (3) As to the gun; (4) As to the can of gasoline; (5) There was no deliberation; (6) The verdict was against the weight of the evidence; (7) Rulings as to testimony; (8) As to tablets; (9) Requests to charge.

The burden of the defense made by the plaintiff in error and practically the only defense exploited throughout the case is the prostration of the mind of the defendant to that degree which rendered it incapable of forming the deliberate intention to commit murder. Most of the cases in this state on this question are those of drunkenness. But drunkenness is not the only factor which prostrates the mind, for, as stated by this court in *Wilson* v. *State,* 60 *N. J. L.* 171 (at *p.* 184) : "If by law, deliberation and premeditation are essential elements of the crime, and by reason of drunkenness *or any other cause* it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed."

Where a defendant, as here, has been indicted for murder, the law of the Wilson case applies as to degree. See, also, *State* v. *Martin,* 102 *N. J. L.* 388, 402. It will be observed that this defendant does not plead prostration of mental faculties by reason of intoxication, but by reason of other matters, as already stated.

(1) As to the assertion that the entire evidence showed lack of premeditation and deliberation. This of course is a general head and includes all the testimony. He discusses it under subdivisions, as above stated. (a) Worry: The assertion is that defendant was so very much worried because he had all his money where he could not get any of it out; that his health began to fail after he began to worry about money and he had terrible headaches, lost weight and the veins would stand out on his forehead; lost money he had invested; was tricked in trade; corresponded with matrimonial agencies (notwithstanding he had been married for about fifteen years) ; that he did not intend to marry anyone (nor should he) ; tried to get people to finance him, they thought he was too old and would not make a success. This is a fair sample of what is alleged; (c) Drugs: He took something for headaches after he lost his health, first not frequently, then oftener; he used codeine tablets; was taking a medicine to make him sleep, took bromide and chloral; Jail Warden Armstrong said he always complained of headaches; (d) Bodily Disease: The jail physician, Dr. Blythe, found him suffering from a chronic poor heart, chronic bronchitis, chronic bladder condition, marked hyperthropy or enlargement of prostate gland of a chronic nature; also pyorrhea condition fairly severe; had pain in the heart region; had more or less pain all the time in his bladder; pyorrhea might cause infection in other parts; has a hernia; (e) Want of sleep and rest: It is asserted that the mental state of the accused at the time of the homicide did not show premeditation and deliberation.

The showing of premeditation and deliberation can only arise from the condition of the mind, and no one knows of that condition except as it appears to others, and also the plaintiff in error himself. His say-so certainly does not show any such thing as that his mental state was such as not to indicate premeditation and deliberation. Take his own statement:

"We got to Cranford between three and four o'clock in the morning. I didn't know what to do with myself or her.

She wanted me to take her somewheres where we could go to bed. I didn't know where to go or what to do. She got kind of cold and drowsy in the car. I made up my mind there was no way out of it but simply to get rid of her. There was only one seat in the car, except the rumble seat. I then shot her. * * * She was sitting in the front seat at the time. She was dozing, she was not sleeping. I held the gun up over her head and fired one shot. It went in the top of her head. She had a hat on. I then started up the car and drove about three or four hundred yards, turned into the other road, and decided I ought to get rid of her. I drove the three or four hundred yards because I didn't know what to do. I again stopped and dragged her out of the car. I threw a lot of gasoline over her and set fire to her with a match. I got the gasoline from the rumble seat of my car. I kept it there in case I ran out of gas when out driving. Before this I realized it was going to be daylight before long when I got to Cranford and I wanted to get home and I couldn't take her anywheres with me.

"There was nothing between us that prompted me to do this except for the reason that I could not maintain two establishments."

Let it be distinctly remembered, that this murderer did not say when he shot the woman—who, notwithstanding he was a married man, he had bigamously married, deceived and possessed himself of much of her money, for which purpose he married her—that he was suffering from worry, drugs, disease, want of sleep and rest, or make any other excuse whatsoever; but after shooting the woman he stopped and dragged her out of the car and threw a lot of gasoline over her and set fire to her, because he realized that it was going to be daylight before long, and he wanted to get home and could not take her anywhere with him. Could anything apparently be much more willful, deliberate and premeditated? This is practically all we have as to the facts surrounding the immediate killing. And how many men suffer from worry, the taking of drugs, bodily disease, want of sleep and rest! Their name is legion. And these things, taken singly or

together, one or more, are no excuse for crime, unless they produce that prostration of the mental faculties which creates a condition that the law regards as one incapable of forming a deliberate intention to take human life. Campbell, the defendant, was examined as a witness in his own behalf, and testified that he did not intend to kill Mrs. Mowry at any time that night; had no thought of killing her at any time; had no independent recollection of shooting her or of burning her body; did not remember. As to the confession he signed, he was asked: "At the time when that paper was signed did you tell what your thoughts were on the night of the shooting?" Answer: "I have no recollection of doing so." Of course the jury did not have to believe him; nor did they.

Now, is there any evidence of deliberate intention on the part of defendant in this case to take the life of the deceased? Dr. Payne testified that the using of morphine impairs the volition of an individual using it; and his conclusion was that Campbell was sane. Dr. McMurray, that the use of drugs affects the mentality of those using them. He thought that Campbell could distinguish between right and wrong, and that he could and did act with deliberation and premeditation at the time. Dr. Blythe, jail physician, found Campbell suffering from chronic poor heart, bronchitis, bladder condition, a marked hyperthropy or enlargement of prostate gland; that he was a man approximately sixty, pale and emaciated; had a pyorrhea condition, enlarged glands in the neck beneath the jaw, enlargement of the heart, muscular weakness, bronchitis, right inguinal hernia; general condition poor; but said he was sane. Dr. Ward, X-ray specialist, took several pictures of Campbell; his head was not well shaped; there was a condition showing an inflammation of the right frontal sinus and inflammation of the left ethmoid sinus, and many other abnormal conditions; and had tremors when he took X-ray pictures of him. Dr. Blumberg, a specialist, in diseases pertaining to the head, possessing knowledge of the structure of the head and organs encased in the skull, testified as to certain structures and inflammations; that any condition which existed within the cranium suf-

ficient to erode a bony structure was sufficient to cause a marked disturbance in the soft structures connected with the brain, intimating that some such disturbance existed in the case of Campbell. Dr. Payne testified that the physical defects enumerated have more or less influence upon the mental state of the individual, render them more and more mentally unstable; that pyorrhea and abscessed conditions in Campbell's mouth would all tend to irritate the nervous system and render the patient more emotionally unstable. Dr. Lawrence M. Collins testified that Campbell was a psychopathic personality without psychoses (which means without mental disorders), and that he was sane. Other physicians, too, were examined and it is significant that none of them testified that Campbell was insane or could not discriminate between right and wrong. The medical testimony was overwhelmingly against him.

(2) As to the crime itself: This is involved in what has been exploited.

(3) As to the gun: It is argued that the accused did not carry a gun for the deliberate purpose of committing the homicide, but his testimony showed that he owned one. And he bought it fifteen or sixteen years before the homicide and carried it when he went off on automobile trips where he thought he was going to be out nights. He took it out without any purpose in his mind except a habit of having it when he was out night driving. Well, he had it, and it was his habit to take it out nights, and on this occasion he was gone several nights; and whether or not he took it out with the intenton of murdering Mrs. Mowry with it, nevertheless, he did so, and it is quite immaterial whether he took it with him expressly to murder her with, or, having it along for other purposes, he deliberately used it for the purpose of the murder in question. The question is not how did he come to have it, but for what purpose he used it.

(4) As to the can of gasoline: He says he got the gasoline from the rumble seat of the car. It was there in case he ran out of gas in driving; that he did not purchase it expressly for the trip he was on when the homicide occurred. It is ap-

parent that it makes no difference whether he purchased the can of gasoline for the deliberate purpose of destroying the body of Mrs. Mowry after killing her, or whether it was casually in his car and he used it for that purpose.

(5) There was no deliberation: This has already been answered. The statement shows deliberation and no witness said that his mind was dethroned or that he could not distinguish between right and wrong at the time he committed the homicide.

(6) The verdict was against the weight of the evidence: On the contrary the verdict was entirely in accordance with the weight of the evidence.

In *State* v. *Treficanto, post, p.* 344, it was held *inter alia* that to justify setting aside a verdict as against the weight of the evidence, that fact must be so clear as to give rise to an inference that it was the result of mistake, passion, prejudice or partiality; and that the court should not set aside a verdict even though in its opinion the jury might, upon the evidence, have found otherwise. According to these tests the verdict, and judgment rendered thereon, are to be held unassailable.

(7) Rulings as to testimony: We have examined the testimony and regard the rulings thereon to offer no ground of reversible error.

(8) As to tablets: Speaking of the fatal ride, Campbell stated he believed Mrs. Mowry wanted to take some tablets that she had for something the matter with her head or something else; also that he got her a drink of water to take some medicine with, and she was cold and sleepy and he did not remember where he was; she had some tablets of some kind in her handkerchief; he did not think he gave her any medicine; when she took the tablets she said she had something the matter with her, a headache or something of that kind, but he did not know where the tablets came from; he thought she took them out of her handkerchief; he did not see them. It will be seen at a glance that there is nothing to this testimony.

(9) Requests to charge: It would be quite purposeless to set out in detail all the requests to charge; many of them were charged and as to those that were not specfically given

to the jury so much of them as was pertinent was included in the charge as delivered. The charge in our judgment is without error.

Campbell said he met Mrs. Mowry through a matrimonial agency; they corresponded; they were married in Elkton, Maryland, in August, 1928; he went to his home and she went to hers; before doing so, however, they drove to New Brunswick and she deposited $1,000 in a bank there in a joint account which they opened; he drew that money out, but sent her at intervals $20, $30, $25 and $10, until the account came to about a couple of hundred dollars; they got together again February 21st, 1929, at Broad street station, Philadelphia; they went to Dover, Delaware, stayed all night and started to drive back toward his home next day; for a while they drove around miscellaneously, got to Cranford about three or four o'clock in the morning; he did not know what to do with himself or her; she wanted him to take her somewhere where they could go to bed; he did not know where to go or what to do; she got somewhat cold and drowsy and he made up his mind that there was no way out of it but simply to get rid of her; he then shot her; she was dosing, not sleeping, he held the gun up over her head and fired one shot; it went into the top of her head; he then started up the car and drove about three or four hundred yards and decided to get rid of her; did not know what to do; he again stopped and dragged her out of the car and threw a lot of gasoline over her and set fire to her with a match; there was nothing between them that prompted him to do that except for the reason that he could not maintain two establishments; he went home, took her grip and threw it into the furnace without looking into it; nobody in the house knew he did it, that he did it after he got up the next morning; he did not intend to marry the woman originally but married her thinking it might relieve him of some financial difficulties which he had been in for two years or more.

It may well be that Campbell did not intend to murder Mrs. Mowry before he was married to her, but only to despoil her of her money and take the chances of what would occur, leaving the future to develop what it would. She evidently

was insistent upon his establishing a home for her and taking her there. He may not even have harbored an intention to kill her when he met her in Philadelphia and took the fatal ride toward his home. He may not even have intended to kill her until that morning when at or near Cranford.

There was a double motive for the crime, first, to conceal his marriage and her identity, and, second, to prevent a demand by her for an accounting of the money that he had fraudulently acquired from her under the guise of husband. And be it remembered that if a criminal act is charged and proved the establishment of a motive is not necessary to support a conviction. In 16 *Corp. Jur.* 529, § 995, it is stated that it is not incumbent on the state to prove either the presence or the absence of motive. Of course motive may be presumed from proven facts; and here, as stated, abundant motive appears. And the motive and the act prove the guilt of the defendant which need not have been conceived save for an appreciable length of time prior to committing the homicide, which period may be very short.

As already has been said, the cases in this state on prostration of mind are those in which liquor has been the exciting, or the deadening, cause. Now, if we will substitute for the effects of liquor the effects of a mind said to be prostrated by worry, the taking of drugs, bodily disease, want of sleep and rest, we will more readily see the application of the cases about to be quoted from, to the case at bar.

In the recent case of *State* v. *Treficanto, supra,* this court observed: "Counsel for defendant, Treficanto, cites in support of his contention the case of *Wilson* v. *State* (*Court of Errors and Appeals,* 1897), 60 *N. J. L.* 171, and says that in that case the court laid down the rule: 'If the evidence is sufficient to satisfy the jury that the intoxication of the accused at the time of the homicide was so great as to prostrate his faculties and render him incapable of forming the specific intent to kill which is the essential ingredient of murder of the first degree, the prisoner will not be entitled to acquittal, but his offense will be murder in the second degree.' This is to be found at page 185, and is an excerpt from the charge of Mr. Justice Depue in State *v.* Martin, in

the Essex Oyer and Terminer in 1881; affirmed in the Supreme Court, 1883. It is pertinent to remark that the learned justice proceeded further to say: 'You should carefully discriminate between that excitable condition of mind produced by drink, which is not incapable of forming an intent, but determines to act on a slight provocation, and such prostration of the faculties by intoxication as puts the accused in such a state that he is incapable of forming an intention from which he shall act. 4 *N. J. L. J.* (1881), 339.'

"Mr. Justice Van Syckel wrote the opinion in Wilson *v.* State, and he went on to say, at page 185: 'As observed by the learned judge in the Martin case, this rule should be applied with caution, that no undue or dangerous immunity or license be given to crime by persons whose passions are inflamed by drink.' And, further: 'So long as the mind of the criminal is capable of conceiving the purpose to kill, he must be held to the responsibility of one who is sober, and that is the language of the cases upon this subject.' "

In *State* v. *Bonofiglio,* 67 *N. J. L.* 239 (at *p.* 243), this court cited with approval the language of Mr. Chief Justice Green in the case of *Donnelly* v. *State,* 26 *N. J. L.* 463, 510: "To constitute murder in the first degree there must be an intention to take life. No particular length of time need intervene between the formation of the purpose to kill and its execution. It is not necessary that the deliberation and premeditation should continue for an hour or a minute. It is enough that the design to kill be fully conceived and purposely executed." See, also, *Ibid.* 616; *State* v. *Sage,* 99 *N. J. L.* 229, 235; *State* v. *Fuersten,* 103 *Id.* 383, 387.

Now, the prisoner at least knew the difference between right and wrong. And that is the test in this state as to responsibility for crime. In *Mackin* v. *State,* 59 *N. J. L.* 495, Chief Justice Gummere, speaking for the Court of Errors and Appeals, at page 496, said: "The instruction complained of is taken from the response of the English judges to the inquiry put to them by the house of lords, in *McNaghten's Case,* 10 *Cl. & F.* 210, as to what are the proper questions to be submitted to a jury when a person, alleged to be afflicted with insane delusion, is charged with the commission

of a crime, and insanity is set up as a defense. The answer of the judges to this question, delivered by Lord Chief Justice Tindal, was that the jury should be instructed that, 'to establish a defense on the ground of insanity it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong.' The rule established in McNaghten's case was, shortly after its publication in 1843, adopted by Chief Justice Hornblower in the case of *State* v. *Spencer,* 1 *Zab.* 196, and since that time has been universally accepted, by the criminal courts of this state, as the test to be applied in cases where insanity has been set up as a defense to an indictment. A rule of such importance, which has become so completely imbedded in the administration of the criminal law, must be considered as no longer subject to challenge. *Graves* v. *State,* 16 *Vr.* 208; *Genz* v. *State,* 59 *N. J. L.* 488. The instruction to the jury, which is complained of, being in accordance with the rule adopted in this state, cannot be successfully attacked."

It cannot be doubted but that Campbell knew the difference between right and wrong. The testimony clearly indicates it and the jury so found. See, also, *State* v. *James,* 96 *N. J. L.* 132, 152; *State* v. *Noel,* 102 *Id.* 659, 676, 684.

One other subject should be adverted to, and that is what occurred in the court room when the jury returned and requested to again hear the testimony of two witnesses. It was this:

"The Court: I understand that the jury has come for some instructions from the court.

"The Foreman: Your honor, we would like to hear again the testimony of Dr. Payne, and the physician from Greystone Park, whose name I do not recall.

"The Court: I would be glad to afford you the opportunity of inspection of the testimony if I were permitted to do so, but I do not understand that that is the practice. You have heard the testimony and you will need to determine upon it from your own recollection as to what that

testimony was. Is there any other instruction that you desire from the court?

"The Foreman: That is all, I believe."

Counsel for the prisoner excepted to the judge's statement and error has been assigned thereon. He argues that in Montana and California under statute the jury is entitled to have re-read part of the testimony, and in an early case from New York it was held that after the jury have retired they may come back and hear the evidence of a thing of which they are in doubt. We have no statute on the subject and the New York law has no controlling effect here. The only case from this state which is cited in support of the alleged error is *State* v. *Bavier*, 89 *N. J. L.* 214, 216, where certain jurors declared that they had not heard more than half of what a witness said, and others that they had not heard the last part of the testimony. The stenographer without instructions read the last two questions and answers; and claim was made on appeal that the trial court should have directed the whole of the testimony to be read. There was no request made, and this court held that if counsel considered that there should be a further reading he should have applied to the court to direct that course; failing to do that the defendants could not complain of non-action on the part of the court. This was simply ruling upon what had occurred in the cause and did not have or receive any exposition of the law governing the subject here under review. Counsel for the state says that it is discretionary with the court whether or not the facts should be repeated to the jury and that the refusal of the trial judge to have it read was not an abuse of his discretion. The judge refused the request of the jury because he said that it was not the practice. That may well be; and his ruling was right no matter what cause he assigned for it.

The matter of reading any portion of the testimony given in a case appears to be a matter of discretion in the trial court. See 16 *Corp. Jur.* 1089, § 2559, *and notes*. It has been held that the practice of taking notes by jurors is improper and is not to be commended. *United States* v. *Davis*, 103 *Fed. Rep.* 457. In that case, at page 470, the court said

that the practice of taking notes by jurors is an improper one; that it gives the juror taking notes an undue influence in discussing the case when he appeals to his notes to settle conflicts of memory; that it is perhaps a matter within the discretion of the court.

Reading by the court to the jury of the testimony of one or more witnesses gives to that testimony of those witnesses an undue prominence over the other testimony which is not so read and is akin, in a way, to the undue influence of notes taken by a juror and read in the jury room. The refusal of the trial judge to read the testimony of the doctors requested by the jury certainly was discretionary, and was not an abuse of discretion. The jury were certainly obliged to rely upon their best recollection as to what that testimony was, as well as to all the other testimony which was before them in the cause.

This case, as already said, is here under the broad and liberal provisions of section 136 of the Criminal Procedure act (2 *Comp. Stat., p.* 1863), wherein it is provided *inter alia,* that on the argument the entire record shall be considered and adjudged by the appellate court, which shall remedy any wrong or injury appearing therein; provided, that no judgment given upon any indictment shall be reversed for any error except such as shall or may have prejudiced the defendant in maintaining his defense upon the merits.

We have examined the entire record, and from what has been stated above it clearly appears that no wrong or injury has resulted to the defendant upon the trial of the cause, and that he has not been prejudiced in maintaining his defense upon the merits.

Let the judgment of the Oyer and Terminer, which is under review herein, be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, KALISCH, BLACK, CAMPBELL, LLOYD, BODINE, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, DEAR, JJ. 14.

*For reversal*—None.