**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0069-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SQUIRE FOSTER, a/k/a
MICHAEL DARBY,
SQUIRE JOHNSON, SQUIRE
EMANUEL FOSTER, and
SQUIRE EMMANUEL FOSTER,

     Defendant-Appellant.

_____

Argued September 10, 2019 – Decided September 26, 2019

Before Judges Yannotti, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 17-01-0012.

Peter Thomas Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Peter Thomas Blum, of counsel and on the brief).

Rookmin Cecelia Beepat, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson

County Prosecutor, attorney; Jaimee M. Chasmer,
Assistant Prosecutor, on the brief).

PER CURIAM

Defendant was tried before a jury, found guilty of aggravated assault and other offenses, and sentenced to an aggregate term of ten years of incarceration, with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals from the judgment of conviction (JOC) dated August 3, 2017. For the reasons that follow, we affirm in part, reverse in part, and remand for entry of an amended JOC and further proceedings.

I.

A Hudson County grand jury charged defendant with: second-degree aggravated assault by purposely or knowingly causing, or attempting to cause, serious bodily injury to David Halley (Halley), N.J.S.A. 2C:12-1(b)(1) (count one); first-degree robbery of Halley, N.J.S.A. 2C:15-1(a)(1) (count two); third-degree criminal restraint of Halley in circumstances exposing him to risk of serious bodily injury, N.J.S.A. 2C:13-2(a) (count three); third-degree making terroristic threats to Halley and Hodge, N.J.S.A. 2C:12-3(b) (counts four and seven, respectively); fourth-degree unlawful possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-5(d) (count five); third-degree possession of

a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count six) and criminal restraint of Hodge by holding her in a condition of involuntary servitude, N.J.S.A. 2C:13-2(b) (count eight).

Prior to trial, the trial judge conducted a <u>Wade</u>[1] hearing, and ruled that the State could admit a statement Hodge provided to law enforcement, in which she identified defendant. The judge also conducted a hearing to determine whether the State could admit defendant's statement to the police. The judge ruled that the State could admit defendant's statement. The judge noted that although defendant had not been informed of his <u>Miranda</u>[2] rights, his statement was spontaneous and not made in response to any police questioning. In addition, the judge ruled that the State could admit recordings of two 9-1-1 calls made shortly after the offenses were committed.

In June 2017, defendant was tried before a jury. At the trial, Halley testified that in the early morning hours of September 3, 2016, he was at an apartment in Jersey City, where his girlfriend and children were living. Halley knew defendant and said that sometimes in the morning, he and defendant would "go get coffee." At around 4:45 a.m. or 5:00 a.m., defendant arrived and

---

[1]  <u>United States v. Wade</u>, 388 U.S. 218 (1967).
[2]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

A-0069-17T2

knocked on the window. Halley got dressed, left the apartment, and joined defendant.

Defendant told Halley he needed to stop at his residence. At the time, defendant and Hodge were living nearby in a rooming house. Defendant and Halley went into the house, and Halley stopped to use the bathroom. Thereafter, Halley went into a room that defendant had entered. Halley testified that when he first entered the room, defendant was speaking with Hodge, and Halley was on his cell phone, waiting for defendant "to finish whatever he was doing." Halley stated that defendant's conversation with Hodge became hostile. Defendant was questioning Hodge "over and over about cheating on him" and "a condom situation."

Halley had been sitting on a recliner, and as he started to get up, defendant stabbed him in the thigh with something sharp. Halley said he "sat back down," concerned that defendant had stabbed him in his main artery. He felt a "warm feeling," and saw a "big gash," which was spilling blood. Halley asked for a rag. Halley testified that defendant had been drinking liquor and defendant claimed it contained four grams of "Molly."[3] Defendant handed Halley a rag,

---

[3] "Molly" is methylenedioxy-methamphetamine (MDMA), a drug also known as "Ecstasy."

A-0069-17T2

and commented that Halley had probably used it to wash off his genitals. Halley placed the rag on his wound, and defendant accused him of sleeping with his "woman."

Defendant took Halley's cell phone and checked to see if it had Hodge's number. Later, defendant stabbed him in the leg several times, using a knife with a fold-up blade. Halley described the knife as about four to six inches in length, with a black and red handle. Halley further testified that defendant held him "hostage" for several hours and "tormented" him. Around 7:00 a.m., Halley was "feeling woozy." When defendant saw him "make a move," defendant hit him in the other thigh.

Several hours later, Halley again attempted to leave the room and jumped behind Hodge. Defendant told Hodge if he had to "hurt" Halley, he was going to kill her too. Hodge managed to get out of the room, leaving Halley behind with defendant. Defendant told Halley he was going to stab him in the heart and then stabbed Halley in the chest.

Halley held defendant with one hand as defendant stabbed him again. He pushed defendant back, opened the door, and limped out of the room. Halley went to the front door, which was locked. Defendant stabbed Halley in his back and kidney area. Halley then struck defendant with his elbow. Defendant

5

stumbled and fell back. According to Halley, defendant tried to stab him in his "private area."

Defendant opened the front door and told Halley he was not "going to get too far." Halley stumbled down the steps and ran to his girlfriend's apartment. The Jersey City police and emergency service workers arrived there and transported Halley to the Jersey City Medical Center (JCMC), where he was treated for his injuries.

Hodge testified that in September 2016, she and defendant were living together in a rooming house in Jersey City. Defendant was her fiancé. Early on the morning of September 3, 2016, Hodge and defendant were in their room. Halley was there also, and they were "just talking."

The assistant prosecutor asked Hodge if defendant had become hostile. She replied that she had been drinking at that time and her memory was "kind of fuzzy." She stated that when they were in the room, "everything was fine." She did not recall seeing defendant with a knife or seeing him stab Halley.

The State sought to admit a recorded statement that Hodge provided to the Jersey City police officers on the day of the incident. The trial judge conducted a Gross[4] hearing, outside the presence of the jury, and ruled that the State could

---

[4] State v. Gross, 121 N.J. 1 (1990).

A-0069-17T2

admit Hodge's statement.  The recording of the statement was played for the jury.

In her statement, Hodge said that she, defendant, and a person she knew as "D" had been in their room, and she identified Halley as "D."  She commented that defendant had begun to question her about a condom he found several days earlier on the floor of the bathroom in the rooming house.

According to Hodge, defendant implied that she and Halley had sex in the bathroom.  When Hodge denied having any such encounter, defendant told her that she was lying.  Halley asked defendant what she had been lying about. Hodge told Halley that she and defendant had "trust issues."

Hodge stated that Halley got up and suggested that they go to the store. Defendant continued to question Hodge and Halley about the alleged sexual encounter and then stabbed Halley in the leg.   Defendant said he knew Hodge and Halley "had some kind of relationship or some kind of dealings," but she told defendant she did not know Halley.

Hodge saw that Halley was bleeding.  She said defendant should relax, but defendant was threatening and "looked really agitated."  Hodge stated that Halley had "a bad injury."  She told defendant he had to stop because Halley had

A-0069-17T2

not done anything, but defendant did not believe her. She said defendant went on a rant, called her a bitch, and told her to shut "the fuck up."

Defendant then demanded that Hodge tell him everything, but she said there was nothing to tell. Defendant told Halley he had "violated" him and "this is [his] justice for doing it." Hodge again told defendant nothing had been going on between her and Halley. Defendant stated that Halley could not leave the room until he told the truth, and that he would not let him leave with his life. Defendant punched Halley in the face.

Hodge stated that Halley got up and tried to leave the room. He jumped on the bed, screaming. According to Hodge, Halley told defendant he was not going to die "because of this." Halley insisted he had done nothing wrong. Halley grabbed a ten-pound weight to defend himself, jumped off the bed, and positioned himself behind Hodge.

Defendant told Hodge that if she did not move, he would cut her also. She ran out of the room. As Hodge was leaving, she saw defendant stab Halley in the shoulder. Hodge's daughter also lived in the rooming house. Hodge ran to her daughter's room, and later, her daughter told her she saw Halley leave Hodge's room. Defendant and Halley left the house. Someone called the police, and officers arrived ten minutes later.

8

The State played the tapes of the two 9-1-1 calls, and Dr. Victor Ha, a trauma surgeon at JCMC, who treated Halley, testified. Ha stated that Halley had a total of nine stab wounds. He had wounds to his back, right leg and thigh, left thigh, and between his chest and abdomen. Ha testified that he was concerned about the wounds in or near Halley's chest, because they were close to his heart. Ha found, however, that Halley's wounds were not life-threatening.

Officer Wayne Rodriguez of the Jersey City Police Department (JCPD) testified that he works in the unit that handles 9-1-1 and other calls. Rodriguez received a call at around 9:42 a.m. on September 3, 2016. The caller reported that her boyfriend had been stabbed, and he was in the backyard of their residence.

Officer Sean Butler of the JCPD was on duty on the morning of September 3, 2016. He testified that he responded to the scene and spoke with Hodge, who pointed out a male walking down the street, and stated that he had just stabbed "somebody." She also said that the man who had been stabbed was in the backyard of a residence on the street. Butler found Halley in the yard. He was bleeding heavily, but still conscious. Halley gave Butler a description of the individual who stabbed him.

 A-0069-17T2

JCPD Officer Steven Dua testified that on September 3, 2016, he responded to the report of a domestic violence incident and possible stabbing. He discovered defendant walking down the street and ordered him to the ground. Dua said defendant was in possession of two cell phones.

Emergency medical technician (EMT) Matt Kiefer also responded to the scene. He found a man in the backyard of a residence, who had been stabbed multiple times. He thought the man's condition was life-threatening. Kiefer and other EMTs dressed the wounds, controlled the bleeding, and transported the man to the hospital.

Officer Jorge Lopez of the JCPD also responded to the scene. He testified that he and other police officers located defendant and placed him in handcuffs. Lopez said that defendant's clothes were bloodstained, but he did not have any injuries. According to Lopez, defendant stated at least three times, "not to flush the rubber."

After the State rested, defendant moved for a judgment of acquittal on the robbery charge. The judge denied the motion.

Defendant then testified that in September 2016, he was living with Hodge in a room in a rooming house in Jersey City. He knew Halley, having first met him a month or two earlier, and they had certain things in common. According

to defendant, he and Halley used drugs on a daily basis, including Molly, marijuana, and PCP.[5]

On September 3, 2016, at around 4:00 a.m. or 5:00 a.m., defendant called Halley because defendant had "some good stuff." Halley did not answer the call so defendant sent him a text message. Halley was at his girlfriend's apartment, which was nearby, and defendant walked there. Halley was speaking with "some dude" about PCP. Halley took defendant inside.

Defendant testified that Halley got into an argument with his girlfriend. Defendant and Halley left the apartment and walked to the rooming house where defendant was living with Hodge. Defendant thought some of Halley's comments were strange because several days earlier, defendant found a condom in the bathroom in the rooming house, and he thought Halley was boasting about it.

Defendant invited Halley inside. According to defendant, they were already high, and he "was just going with the flow, just relaxing." He stated that they were "popping [M]olly." They went to defendant's room. Defendant laid down on the bed, "smoking." Hodge was sitting on the bed with him.

---

[5] PCP is Phencyclidine, a mind-altering drug that may cause hallucinations.

A-0069-17T2

Halley said he had to use the bathroom and left. Defendant thought Halley was "taking long," and he went to check on him. He saw Halley standing outside the room. They came back into the room, and Halley told defendant he had something he wanted to tell him.

According to defendant, Halley mentioned the best friend of Hodge's daughter and a "whole bunch of other stuff." Defendant thought Halley did not know Hodge, and he wondered how Halley knew Hodge's daughter and her friend. Defendant said that at that moment, he could not breathe.

Defendant noted that he had not previously mentioned the condom to Halley because Hodge said she had never seen Halley before. Defendant testified that he, Hodge, and Halley were in the room, and he was "still smoking." He remembered arguing with Halley, but claimed he did not know "exactly [what] we [were] arguing about." He stated that he did not remember what happened after that.

On cross-examination, the assistant prosecutor showed defendant a photograph, which was taken when he was arrested. He admitted that the photo showed his pants covered in blood. He was asked if he sustained any injuries that day, and he replied, "Not that I can recall." Defendant stated that if there was blood on his pants, it was not his. He also stated that two days before

12

September 3, 2016, he found a condom in a bathroom that the residents of the rooming house used. He was confused because "nobody else in the house used condoms."

Defendant was suspicious because Hodge previously had been unfaithful to him. He also was suspicious of Halley. He testified that on September 3, 2016, Halley said some things, which made defendant believe Hodge lied to him when she said she did not know how the condom got in the bathroom.

The prosecutor asked defendant to identify the last thing he remembered before he woke up at the police station. He replied that he thought he had been telling Halley not to say anything else, because there is always two sides to every story. He did not recall the time of day when this happened.

Defendant added that he was not "thinking of time at that point." He recalled that early in the morning on September 3, 2016, he was in his room with Hodge and Halley. The prosecutor showed defendant photos of Halley's wounds, and defendant denied he stabbed Halley.

At the charge conference, defendant asked the judge to instruct the jury on voluntary intoxication. The judge denied the application. The judge stated that Hodge had not credibly testified about certain facts. The judge noted that Hodge had feigned memory loss and fabricated facts about the drugs she had

A-0069-17T2

taken and the alcohol she had consumed. The judge also found defendant was not credible when he testified that he blacked out during the incident.

It appears that the judge became ill and was unable to continue with the trial. Therefore, another judge charged the jury.

The jury found defendant guilty on count one (aggravated assault of Halley); not guilty of robbery, as charged in count two, but guilty of the lesser-included offense of theft as to Halley; and guilty on counts three (criminal restraint of Halley), four (terroristic threats to Halley), five (unlawful possession of a weapon); and six (possession of a weapon for an unlawful purpose). The jury also found defendant not guilty on counts seven (terroristic threats to Hodge) and eight (criminal restraint of Hodge).

The trial judge sentenced defendant on July 28, 2017, and thereafter entered the JOC. This appeal followed.

On appeal, defendant presents the following arguments:

> POINT I
> A NEW TRIAL SHOULD OCCUR BECAUSE THE COURT MISTAKENLY REFUSED TO CHARGE THE JURY ON VOLUNTARY INTOXICATION WHERE THE DEFENDANT TESTIFIED THAT HE HAD CONSUMED A LARGE QUANTITY OF INTOXICANTS AND HAD THEN BLACKED OUT DURING A BIZARRE OFFENSE. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

POINT II

A NEW TRIAL SHOULD OCCUR BECAUSE THE JURY INSTRUCTIONS OMITTED AN ELEMENT FROM COUNT 2 AND ENTIRELY OMITTED COUNTS 3 AND 4. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARAS. 1, 9, 10. (Not raised below).

POINT III

THE LESSER INCLUDED OFFENSE OF UNLAWFUL POSSESSION OF A KNIFE (COUNT 5) SHOULD MERGE INTO POSSESSION OF A KNIFE FOR AN UNLAWFUL PURPOSE (COUNT 6). (Not raised below).

POINT IV

A RESENTENCING SHOULD OCCUR BECAUSE THE COURT DID NOT CONSIDER MITIGATING FACTOR FOUR, EVEN THOUGH EVIDENCE SEEMED TO SUPPORT IT. (Not raised below).

II.

We first consider defendant's argument that the trial judge erred by denying his request for an instruction on voluntary intoxication. Defendant contends that before he allegedly committed the charged offenses, he had consumed a large quantity of intoxicants and then blacked out. He claims sufficient evidence was presented at trial showing his faculties were so prostrated that he could not have acted purposefully or knowingly.

When an offense requires proof that a person act "purposely" or "knowingly," evidence of "voluntary intoxication" may be admitted "to disprove

A-0069-17T2

the requisite mental state." State v. Cameron, 104 N.J. 42, 53 (1986). However, the trial court is not required to submit the issue to a jury unless there is sufficient proof that the intoxication caused a "prostration of the faculties" that "puts the accused in such a state that he is incapable of forming an intention from which he shall act." Id. at 54 (quoting State v. Treficanto, 106 N.J.L. 334, 352 (E. & A. 1929)).

"[To] successfully invoke the defense, an accused must show that he was so intoxicated that he did not have the intent to commit an offense. Such a state of affairs will likely exist in very few cases." Ibid. (quoting State v. Stasio, 78 N.J. 467, 495 (1979) (Pashman, J., concurring and dissenting)). To qualify for the defense of voluntary intoxication, "the intoxication must be of an extremely high level." Ibid.

In determining whether the intoxication results in a "prostration of faculties," the trial court should consider:

> the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others (what he said, how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested itself), any odor of alcohol or other intoxicating substances, the results of any tests to determine blood-alcohol content, and the actor's ability to recall significant events.
>
> [Id. at 56.]

Here, the record supports the trial judge's determination that there was insufficient evidence from which a jury could rationally find that because he had consumed certain intoxicants, defendant's faculties were so prostrated that he could not act purposely or knowingly when he committed the offenses. As we stated previously, Halley testified that defendant had been drinking alcohol and claimed to have consumed four grams of Molly. Defendant testified that he was "high" when he arrived at his rooming house, and was "popping Molly" while there. He also testified that he had been "smoking," but did not specify which drug. Hodge and Halley testified, however, that they all were smoking PCP at the rooming house.

We note that testimony defendant ingested drugs and alcohol is not, standing alone, sufficient to require an intoxication charge. Here, there was no evidence as to the specific quantities of drugs defendant consumed other than Halley's comment that defendant claimed he had ingested four grams of Molly. Defendant apparently consumed Molly and PCP but did so over a period of several hours. Moreover, and most important, there was no testimony explaining the effects Molly and PCP would have on the person consuming these drugs.

A-0069-17T2

We also note that defendant testified that he blacked out when he first began to stab Halley. As the trial court pointed out, however, in denying the application for an instruction on voluntary intoxication, defendant had "an excellent memory" as to what had occurred before he began to stab Halley. He recalled that he had become convinced that Hodge had not been faithful to him, and had engaged in sexual relations with Halley.

Furthermore, as recounted by Halley and Hodge, the events that formed the basis for the charges took place over several hours. During that time, defendant repeatedly stated that his intention was to bring Halley to "justice" for violating him and Hodge. Defendant was never incapacitated. He checked Halley's phone for evidence of Hodge's purported infidelity, kept Halley in the room, and continued to threaten and torment Halley.

We conclude the evidence regarding defendant's intoxication was insufficient to support the conclusions that defendant did not act purposely and knowingly when he repeatedly stabbed Halley, took his phone, threatened him, and refused to let him leave the room. This, then, is not one of the rare cases in which an instruction on voluntary intoxication is warranted.

In support of his argument that the court erred by refusing to charge the jury on voluntary intoxication, defendant cites State v. Nutter, 258 N.J. Super.

41 (App. Div. 1992). In that case, the defendant was convicted of murder and certain weapons offenses. Id. at 43. The defendant admitted he stabbed the victim, who was the woman with whom he had been living at the time. Id. at 44. Witnesses testified that the defendant and the victim had argued, and they were pushing and punching each other. Id. at 47.

According to the witnesses, the defendant stabbed the victim in the right side of her stomach. Id. at 48. The defendant thereafter turned off the lights, stated that he was "blind," and said he would call the hospital but he never did. Ibid. The defendant fell asleep on the floor, and several days later, stuffed the victim's body in a closet. Ibid.

The victim's daughter testified that the defendant and her mother had been drinking earlier on the day the stabbing occurred. Ibid. After the police found the body, an officer spoke to the defendant and he admitted killing the victim. Id. at 50. He told the police he was drunk at the time, and he had consumed a "half of a fifth of Mad Dog 20/20 and a six pack of beer." Id. at 51. He said that "something just snapped in [his] head." Ibid.

We reversed the defendant's convictions because the victim's children had been allowed to testify on closed-circuit television, which was not permitted by statute. Id. at 53-58. We remanded the matter for a new trial, and noted that on

19

remand, the trial court should "carefully assess the evidence adduced in light of [the] defendant's claimed entitlement to an instruction on . . . intoxication." Id. at 58.

We observed that the evidence presented at trial showed a "fight fueled by alcohol," and that the stabbing had not been pre-planned. Id. at 59. There also was evidence of a "single stab wound," and a claim by the defendant that he "snapped." Ibid. We noted that there was evidence "of significant alcohol use," as well as evidence that the defendant engaged in certain "bizarre" actions and had memory loss. Ibid. We concluded that there was "a jury question as to whether [the] defendant's faculties were so prostrated that he was incapable of forming an intent to commit the crime of murder." Ibid. (citing State v. Mauricio, 117 N.J. 402, 418 (1990)).

In our view, defendant's reliance on Nutter is misplaced. In Nutter, there was specific testimony as to the amount of liquor the defendant consumed, while the evidence in this case primarily consists only of general statements as to defendant's consumption of alcohol and drugs. In Nutter, there was a single stab wound, while in this case, there is evidence that defendant stabbed Halley nine times, over a period of several hours.

Although defendant claimed he blacked out when he first stabbed Halley, the evidence shows that thereafter defendant held Halley in the room for hours, threatened him, checked his phone, and stabbed him several more times. These actions negated any rational inference that defendant's faculties were so prostrated that he was not capable of committing the offenses for which he was charged purposefully or knowingly.

We therefore conclude the trial judge did not err by refusing to charge the jury with voluntary intoxication.

## III.

Next, defendant argues, for the first time on appeal, that the trial court erred by omitting an element in the instructions on theft, as a lesser-included offense of robbery. In addition, defendant argues that the court erred by failing to charge the jury on counts three and four, in which defendant was charged with criminal restraint and making terroristic threats, respectively.

Jury instructions should serve as a "road map to guide the jury" in its deliberations, State v. Martin, 119 N.J. 2, 15 (1990), and provide an accurate, "comprehensible explanation of the questions that [it] must determine, including the law of the case applicable to the facts that [it] may find," State v. Green, 86 N.J. 281, 287-88 (1981). Jury instructions must address every element of the

21

offense.  State v. Vick, 117 N.J. 288, 291 (1989).

Where, as in this case, the defendant does not raise a timely objection to an error in the jury charge, we review the instruction under a plain-error standard.  State v. Afanador, 151 N.J. 41, 54 (1997).  Reversal is warranted only where the error, considered in the context of the charge as a whole, "prejudicially affect[s] the substantial rights of the defendant sufficiently grievous[ly] to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Jordan, 147 N.J. 409, 422  (1997) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

Here, the court instructed the jury on theft and stated that a person is guilty of this offense

> if he unlawfully takes or exercises unlawful control over movable property of another with purpose to - - to deprive him thereof.  The State must prove each of the following elements beyond a reasonable doubt:  [(1)] that defendant knowingly took or unlawfully exercised control over movable property; (2) that the movable property was property of another; [and] (3) the defendant's purpose was to deprive the other person of the movable property.

The court did not instruct the jury on the "from the person" element of the offense.  See N.J.S.A. 2C:20-2(b)(2)(d).  To establish this element, the State

"must prove that at the time of the theft, the property stolen was within the immediate custody and control of another."  Model Jury Charges (Criminal), "Theft from the Person (N.J.S.A. 2C:20-2(b)(2)(d))" (approved Apr. 15, 2014).

The court's failure to instruct the jury on this element was not, however, an error "clearly capable of producing an unjust result."  R. 2:10-2.  At trial, Halley testified that he was in possession of a cell phone, and defendant took the phone from him to check it for evidence that Halley and Hodge were having a relationship.  Halley's testimony regarding his possession of the phone was unrebutted.

Furthermore, the verdict sheet asked the jury whether the State had proven that defendant "did unlawfully take, or exercise unlawful control over, the movable property, from the person of David Halley, with the purpose to deprive him thereof, . . . ."  We recognize that "[a] verdict sheet is intended for recordation of the jury's verdict and [it] is not designed to supplement oral jury instructions." State v. Gandhi, 201 N.J. 161, 196 (2010) (citations omitted).

Even so, the verdict sheet in this case informed the jury that to find defendant guilty of theft, it had to find defendant took movable property "from the person of David Halley."  It was abundantly clear that to show defendant was guilty of theft, the State had to prove beyond a reasonable doubt that Halley

23

had been in possession of the cell phone, and defendant took the phone from his "person." Therefore, the court's failure to explain the "from the person" element of the offense was not an error "clearly capable of producing an unjust result." R. 2:10-2.

Defendant also argues that the court's failure to instruct the jury on count four requires reversal of his conviction of that offense. We disagree. In count four, defendant was charged under N.J.S.A. 2C:12-3(b), with making terroristic threats against Halley. However, in count seven, defendant also was charged under N.J.S.A. 2C:12-3(b) with making terroristic threats to Hodge. The record shows that the court instructed the jury on the elements the State had to prove for the jury to find defendant guilty of the offense as to Hodge. The court's failure to read the same instruction regarding the charge pertaining to the threats against Halley was harmless error.

Defendant further argues that his conviction on count three should be reversed because the court failed to instruct the jury on this count. We agree. As stated previously, in count three, defendant was charged under N.J.S.A. 2C:13-2(a) with criminal restraint of Halley in circumstances exposing him to the risk of serious bodily injury.

In charging the jury on count eight, in which defendant was charged with the criminal restraint of Hodge, the judge stated that the counsel had agreed he need not repeat the instructions on criminal restraint, because he had already addressed them with regard to count three. The record shows, however, that the judge never read the instructions on count three.[6]

The model jury instructions for criminal restraint state that the elements of the offense are: (1) defendant knowingly restrained the victim; (2) defendant knew the restraint was unlawful; and (3) the restraint was under circumstances in which the defendant knowingly exposed the victim to the risk of serious bodily injury. See Model Jury Charges (Criminal), "Criminal Restraint (N.J.S.A. 2C13-2a)" (rev. June 19, 2000). The model charge defines the terms "restraint," "unlawful," "serious bodily injury," and the mental state "knowingly." Ibid.

Here, the judge had instructed the jury on the meaning of the terms "serious bodily injury" and "knowingly" in the charge on aggravated assault.

---

[6] We note that in count eight, defendant was charged with criminal restraint under N.J.S.A. 2C:13-2(b) by holding Hodge in a condition of involuntary servitude, not criminal restraint under N.J.S.A. 2C:13-2(a), as charged in count three. The section of the verdict sheet pertaining to count eight referred to N.J.S.A. 2C:13-2(b), but erroneously stated that the offense involved the unlawful restraint of Hodge in circumstances placing her at risk of serious bodily injury. In any event, the jury was never instructed on either count three or eight.

The judge did not, however, instruct the jury on the meaning of the terms "unlawful" and "restraint." We conclude that in the absence of specific instructions on those elements of criminal restraint, the jury did not have the "road map" it required for its deliberations on this offense. Martin, 119 N.J. at 15.

We therefore affirm defendant's convictions on counts two and four, but reverse his conviction on count three and remand for a new trial on that count.

IV.

Defendant presents several arguments regarding his sentence. At sentencing, the trial judge found aggravating factors one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense, including whether the offense was committed in "an especially heinous, cruel, or depraved manner"); two, N.J.S.A. 2C:44-1(a)(2) (gravity and seriousness of the harm inflicted on the victim); three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

A-0069-17T2

The judge sentenced defendant to ten years of incarceration on count one (aggravated assault), with an eighty-five percent period of parole ineligibility, pursuant to NERA.  The judge also imposed concurrent five-year custodial sentences on counts two, three, four, and six; and an eighteen-month prison term on count five.

"An appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard."  State v. Jones, 232 N.J. 308, 318 (2018).  In reviewing a sentence, the court must determine whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record;' [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'"  State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

"An appellate court is bound to affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record."  State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400-01 (1989); Roth, 95 N.J. at 364-65).

A-0069-17T2

Defendant argues that count five (unlawful possession of a weapon) should merge with count six (possession of a weapon for an unlawful purpose). The State agrees with defendant's argument. See State v. Jones, 213 N.J. Super. 562, 568 (App. Div. 1986). Furthermore, as the State acknowledges, because there was no evidence that defendant possessed the knife for any purpose other than to assault Halley, count six should merge with count one (aggravated assault). See State v. Tate, 216, 300, 303 (2013).

Defendant also argues that the judge erred by failing to find mitigating factor four, N.J.S.A. 2C:44-1(b)(4) (substantial grounds tending to excuse or justify defendant's conduct, though failing to establish a defense). At sentencing, defense counsel did not raise this argument. He now argues there is sufficient evidence in the record to support the finding of mitigating factor four.

Defendant notes that the presentence report states that he reported he had an injury to his head several years earlier, and that his mental health had not been "too good." Defendant also reported that since he sustained that injury, he had not been "thinking straight." In addition, at sentencing, defendant's mother told the judge that defendant changed when he hit his head. She also cited the drugs defendant had been taking, which she said "just drove him insane."

We are convinced there is insufficient evidence in the record to support a finding of mitigating factor four. Defendant presented no evidence to support the claim that his head injury affected his cognitive abilities on the day he committed the offenses. Furthermore, defendant's claim that he was intoxicated when he committed the offenses does not excuse or justify his conduct.

Accordingly, we affirm defendant's convictions on counts one, two, four, five, and six; and the sentences imposed on counts one, two, and four. We remand the matter to the trial court for entry of an amended JOC, merging counts five and six with count one. We note that the JOC dated August 3, 2017, mistakenly states that defendant had been charged with and found guilty of theft under N.J.S.A. 2C:20-3(a). The correct cite is N.J.S.A. 2C:20-2(b)(2)(d).

We also reverse defendant's conviction on count three and remand the matter for a new trial on that charge. If defendant is tried again on count three and found guilty, the trial court shall resentence defendant on all counts, after merger of counts five and six with count one.

Affirmed in part, reversed in part, and remanded to the trial court for entry of an amended JOC and further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0069-17T2