**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3664-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMIL HILTON, a/k/a
TWEETY,

     Defendant-Appellant.

_____

Argued October 16, 2023 – Decided December 11, 2023

Before Judges Sabatino, Mawla, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 19-06-0350.

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

Alycia Irene Pollice-Beyrouty, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Samantha Eaton, Assistant Prosecutor, and Laura Sunyak, Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

Tried by a jury, defendant Jamil Hilton was found guilty of armed robbery of a car dealership, carjacking, and other offenses. In this direct appeal, defendant argues several grounds for reversal of his conviction. For the reasons that follow, we affirm.

I.

The State's charges arise out of an armed robbery and carjacking that occurred at the Ewing Auto Outlet on August 12, 2015. Thomas Armitage, a car salesman, was working at the outlet that day along with another employee, Frank Dinatale.

At approximately 4:00 p.m., Armitage observed a man perusing the vehicles on the lot. According to Armitage, the man had a full beard and was wearing glasses, a bluish-gray hat, a dirty and ripped hooded sweatshirt, bluish-gray pants, and black and white sneakers.

Believing the man to be a customer, Armitage went out to speak to him, at which point the man stated that he was there to buy a car. Armitage showed him a 1995 black Lexus LS 400, which the man expressed interest in purchasing. Armitage then led the man inside the dealership to fill out the necessary

2

paperwork. Armitage placed the keys on his desk and grabbed a financing application, and when he turned around, the man was pointing a gun at his head.

The gun-pointing culprit forced Armitage into a back room, where Dinatale was already located. The culprit then took some money from a drawer in the back room as well as Armitage's wallet. As the culprit backed out of the room, he continued to point his gun at Armitage. As he left the building, the culprit took the keys to the Lexus that Armitage had left in the front office. He left the building and drove away in the Lexus. Dinatale then called 9-1-1.

The Lexus was recovered by Sergeant Frederick Dow of the Ewing Police Department about half a mile from the car dealership, with the keys left in the ignition. Forensic testing of the vehicle failed to yield any sufficient fingerprints or DNA evidence. Security footage from the dealership showed the culprit as he entered the building and began pointing his gun at Armitage.

Two days after the robbery, on August 14, Detective Timothy Long of the Trenton Police Department went to a residence on Daymond Street, approximately an eleven-minute drive from Ewing Auto Outlet, at around 10:00 a.m. Long was aware of the robbery that occurred two days earlier due to a "TRAKS" bulletin containing a description of the suspect issued by the Ewing Police Department.

3

Linda Dismukes, defendant's fiancée, answered the door of the residence. She was conversing with Detective Long when defendant descended the stairs. Long testified that he recognized defendant from the TRAKS bulletin, although defendant was not wearing his eyeglasses and had shaved his beard. When asked by Long about his beard and his eyeglasses, defendant replied that he had shaved two days earlier and that his glasses were on his bed. Long told defendant that he believed defendant was "a robbery suspect," to which defendant responded "yeah, you got me." Defendant was then arrested.

While in police custody but before his interrogation, defendant told detectives that the gun used in the robbery was hidden underneath a bush on a grassy lot across the street. Upon inspection of that site, police recovered a bag containing two BB guns and some clothing.

During his interrogation, a video recording of which was played for the jury at trial, defendant confessed that he walked to the dealership and, holding a BB gun, stole $200 and drove away in the Lexus. As defendant admitted to the police, he disposed of the glasses and sweatshirt he was wearing during the robbery and shaved his beard.

At trial, defendant retracted his confession, claiming that he was not the person who robbed the dealership and stole the Lexus. Defendant asserted that,

4

when he spoke with police, he was under the influence of ten bags of heroin he had ingested earlier, which had affected his judgment. He also claimed to have confessed to the crime only because Detective Long had angrily threatened to arrest Dismukes.

As we will discuss in more depth, Armitage identified defendant at trial as the culprit, but Armitage had not participated in any identification procedure (such as a photo array) in the five years between the robbery and the trial. Dinatale, meanwhile, was unable to confirm at trial whether he recognized defendant as the culprit. He likewise had not participated in a pretrial identification procedure.

The other identification testimony linking defendant to the culprit in the surveillance footage came from Detectives Long, Scott Peterson, and William Wolverton. Long is the only one of those detectives who responded to the scene of the robbery.

Defendant was charged by indictment with first-degree robbery, N.J.S.A. 2C:15-1(a)(2) (counts one and three); fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4) (counts two and four); first-degree carjacking, N.J.S.A. 2C:15-2(a)(3) (count five); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count six); third-degree unlawful possession of a

firearm, N.J.S.A. 2C:39-5(b) (count seven); first-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b) (count eight); and second-degree certain persons not to possess a firearm, N.J.S.A. 2C:39-7(b) (count nine).

Before trial, the court granted the State's motion to dismiss counts two, four, six, seven, eight, and nine. The remaining three counts were the two counts of first-degree robbery and one count of first-degree carjacking.

The jury trial on counts one, three, and five was conducted in February 2020. The jury returned a guilty verdict on all three counts.

In November 2020, the court sentenced defendant to an aggregate term of thirty-five years with an 85% period of parole ineligibility pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. Pursuant to the State's motion for a mandatory extended term under the Three Strikes Law, the court resentenced defendant in January 2021 to life imprisonment without the possibility of parole. N.J.S.A. 2C:43-7.1. In May 2021, he was resentenced again to a seventy-five-year term of incarceration, with an 85% period of parole ineligibility on May 14, 2021.[1]

On appeal, defendant raised the following points in his brief:

POINT I

---

[1] Defendant has not appealed his sentence.

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO DISMISS THE CARJACKING CHARGE AT THE CLOSE OF THE STATE'S CASE BECAUSE THE STATE PRESENTED NO EVIDENCE THAT THE VICTIM WAS IN CONTROL OF THE VEHICLE OR NEAR THE VEHICLE OR KEYS WHEN THEY WERE TAKEN.

POINT II

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE ADMISSION OF TESTIMONY FROM THREE INVESTIGATING DETECTIVES THAT DEFENDANT LOOKED LIKE THE PERPETRATOR DEPICTED ON SURVEILLANCE VIDEO WHERE THE DETECTIVES HAD NO FIRST-HAND KNOWLEDGE OF THE INCIDENT, AND WHERE IDENTIFICATION WAS A CRUCIAL AND CONTESTED ISSUE. U.S. Const. amends. V and XIV; N.J. Const. art. I, pars. 1, 9, and 10.

POINT III

DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE PROVISION OF AN UNNECESSARY AND LOPSIDED FLIGHT CHARGE THAT SUGGESTED THAT DEFENDANT ACKNOWLEDGED HE WAS THE ASSAILANT BUT DENIED THAT HIS CONDUCT CONSTITUTED FLIGHT, WHEN, IN FACT, IDENTITY WAS CONTESTED, NOT FLIGHT. U.S. Const. amends. V and XIV; N.J. Const. art. I, pars. 1, 9, and 10. (Not Raised Below)

POINT IV

7

DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE IMPERMISSIBLE INDOCTRINATION OF THE JURY DURING JURY SELECTION. U.S. Const. amends. V, VI, VII and XIV; N.J. Const. art. I, pars. 1, 9, and 10. (Not Raised Below)

At this court's request, the parties also submitted pre-argument briefs addressing the Supreme Court's recent opinions in State v. Watson, 254 N.J. 558 (2023), State v. Burney, 255 N.J. 1 (2023), and State v. Allen, 254 N.J. 530 (2023). Having considered these arguments in light of the record and the applicable law, we affirm defendant's convictions. We reorganize the sequence of the arguments for ease of discussion.

II.

We begin with defendant's contention that the trial court erred in denying his motion to dismiss the carjacking charge at the end of the State's case in chief.

Pursuant to Rule 3:18-1, a defendant may move for a judgment of acquittal "if the evidence is insufficient to warrant a conviction." The applicable test is whether a reasonable jury could, based on the evidence presented at trial, find the defendant guilty of the charge beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 458-59 (1967); State v. Fiorello, 36 N.J. 80, 90-91 (1961). As a reviewing court, we apply this same standard.

The pertinent language of the carjacking statute reads as follows:

> (a) A person is guilty of carjacking if in the course of committing an unlawful taking of a motor vehicle . . . [that person]:
>
> > (1) inflicts bodily injury or uses force upon an occupant or person in possession or control of a motor vehicle;
> >
> > (2) threatens an occupant or person in control with, or purposely or knowingly puts an occupant or person in control of the motor vehicle in fear of, immediate bodily injury;
> >
> > (3) commits or threatens immediately to commit any crime of the first or second degree; or
> >
> > (4) operates or causes said vehicle to be operated with the person who was in possession or control or was an occupant of the motor vehicle at the time of the taking remaining in the vehicle.
>
> [N.J.S.A. 2C:15-2.]

Defendant was convicted pursuant to N.J.S.A. 2C:15-2(a)(3), which required the State to prove that, in the course of unlawfully taking a motor vehicle, he committed, or immediately threatened to commit, any crime of the first or second degree. Notably, subsection (3) is the only subsection of the carjacking statute that does not require proof of the presence of an occupant of the motor vehicle, or a person in possession or control of the motor vehicle.

9

On defendant's motion to dismiss the carjacking charge, both the State and defendant focused on whether Armitage or Dinatale could be considered "occupants" or "persons in possession or control of" the Lexus. In that vein, the trial judge emphasized the proximity of the car keys to defendant pointing a gun at Armitage's head when ruling that the State had produced sufficient evidence to allow a reasonable jury to find defendant guilty of carjacking beyond a reasonable doubt.

Defendant relies on State v. Jenkins, 321 N.J. Super. 124 (App. Div. 1999), in support of his argument that he was entitled to a directed verdict on the carjacking charge. In Jenkins, the defendant approached the victim in a graveyard and robbed him of his money before taking his car keys and driving away. Id. at 126. The defendant was charged with carjacking under subsection (2) of the statute, N.J.S.A. 2C:15-2(a)(2), which requires the presence of an occupant or a person in possession or control of the vehicle. Id. at 129. This court noted in Jenkins that the State, for whatever reason, chose not to prosecute the defendant under subsection (3). Ibid. We reversed the defendant's carjacking conviction because the evidence did not substantiate any sort of proximity between the victim and the vehicle. Id. at 131.

Because defendant in the present case was convicted under subsection (3) of the carjacking statute, proximity was not at issue, despite the focus of the parties and the trial court on that subject. The only fact the State needed to prove under this subsection was whether defendant took the Lexus unlawfully in the course of committing a first- or second-degree offense. The analysis in Jenkins is not pertinent here because it involved a different subsection of the statute.

Here, viewing the record in a light most favorable to the State, there was abundant evidence to support defendant's convictions of first-degree robbery. Those proofs supported the jury's finding that he took the Lexus unlawfully in the course of committing the robbery. Consequently, we affirm the denial of defendant's motion for acquittal on the carjacking count, albeit for analytically different reasons than those stated by the trial court.

III.

Defendant contends the trial court impermissibly allowed the prosecutor to "indoctrinate" the jurors during the voir dire. This argument is founded upon the following query the court posed to jurors at the State's request during voir dire:

> Do you believe that forensic evidence such as DNA and fingerprints are necessary to find someone guilty beyond a reasonable doubt even if there is other

evidence, either direct or circumstantial, that may support a finding of guilt beyond a reasonable doubt?

Three potential jurors expressed reservations about convicting someone in the absence of incriminating forensic evidence. The State excused all three with peremptory challenges.

Although defendant did not object to this line of questioning during the voir dire, he now argues on appeal that the question impermissibly indoctrinated the jury to ignore the absence of forensic evidence, specifically, the lack of DNA and fingerprint evidence in the stolen Lexus.

Because this issue was not raised below by defendant, the plain error standard of review applies. R. 2:10-2. "The error claimed must be so egregious that it 'rais[es] a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Tierney, 356 N.J. Super. 468, 477 (App. Div. 2003) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

We also bear in mind that reviewing courts have generally given deference to a trial court's decisions within the voir dire process "except to correct an error that undermines the selection of an impartial jury." State v. Winder, 200 N.J. 231, 252 (2009). The Court's recent decision in State v. Andujar, 247 N.J. 275 (2021), although it sparked reform in jury selection practices that historically

12

discriminated against certain categories of potential jurors, did not repudiate this general custom of appellate deference to the trial court's handling of the voir dire process.

We recognize that the right to a fair and impartial jury is guaranteed by both the United States and New Jersey Constitutions. U.S. Const. amends. VI, VII, and XIV, N.J. Const. art. 1, ¶¶ 9-10; see also State v. Simon, 79 N.J. 191, 199 (1979). In State v. Manley, the Supreme Court adopted Rule 1:8-3(a), granting trial courts the authority to conduct voir dire while also allowing parties to supplement the court's voir dire questions within the trial court's discretion. 54 N.J. 259, 282 (1969). The purpose of that change in the voir dire process was to "eliminat[e] the efforts [of parties] to indoctrinate, to persuade, [or] to instruct by favorable explanation of legal principles that may or may not be involved" in the subject case. Id. at 280 (emphasis added).[2]

In State v. Little, 246 N.J. 402 (2021), the Court addressed the subject of whether voir dire questions may be directed at the State's inability to produce a particular category of evidence at trial. In that case, the State was unable to

---

[2] As the result of the Court's comprehensive post-Andujar jury selection initiatives, pilot programs are underway in designated vicinages using what is termed "attorney-directed voir dire." Sup. Ct. of N.J., Notice to the Bar: Jury Reforms (Jul. 12, 2022). Those ongoing pilot programs are not at issue in this appeal.

produce the weapon with which the defendant had allegedly assaulted the victim. Id. at 409. The trial court, over the defendant's objections, asked potential jurors whether the State's inability to produce the weapon as evidence would affect their ability to serve. Id. at 411. Jurors who indicated they might be less likely to convict the defendant if the weapon was not produced were excused. Id. at 407.

The Court in Little instructed that "[i]n appropriate cases, the State's inability to present a particular category of evidence can be a legitimate subject for the trial judge to address in voir dire." Id. at 417 (emphasis added). The Court recognized that "[i]f a juror is unwilling to consider the State's proofs absent a specific type of evidence, that juror may be incapable of following the court's instructions or fairly deciding the case." Id. at 417-18.

At the same time, a jury is allowed to consider the State's failure to produce a specific type of evidence when deciding whether the State has met its burden of proof. Id. at 419. The Court ultimately ruled that the trial judge's failure to explain this latter point to the jury in Little rendered the voir dire question an abuse of discretion. Ibid. A voir dire question of this nature must be presented in a balanced manner, so that potential jurors are aware that, although the State is not required to present a certain type of evidence, they may

14

still take the absence of that evidence into consideration when rendering a verdict.  Id. at 420.

Here, defendant argues that the voir dire question regarding forensic evidence, as it was presented to the potential jurors in this case, was unbalanced. He contends the phrasing of the question failed to inform jurors that they would still be allowed to consider the absence of forensic evidence as a factor in evaluating whether the State met its burden of proof.

In response, the State asserts that, unlike in Little, where the proof of a gun was essential to crimes charged, the lack of forensic evidence in this case was not an element of any of the counts against defendant.  It was not necessary for defendant's DNA or fingerprints to be found in the Lexus for him to be guilty of the armed robbery and the other charged offenses.

The State further asserts that the voir dire question "[did] not shift the burden [of proof] but again reminded the jury that the State, not the defendant, carries the burden of proof."  The query expressly referred, twice, to the State's obligation to prove guilt "beyond a reasonable doubt."

Although the voir dire question about forensic evidence posed to the prospective jurors in this case could have been enhanced with a fuller

explanation, we do not discern plain error that requires this case to be retried on that basis.

The lack of forensic evidence recovered from the Lexus, although a factual point in defendant's favor, was not a critical facet of the case akin to the unproduced firearm in Little. The heart of the dispute in this trial was whether or not defendant was the culprit in the surveillance video from the car dealership. What was or was not found in the Lexus after it had been driven away from the dealership was of lesser importance than the video and the observations of the two employees at the scene.

We conclude the alleged shortcomings of the trial court's voir dire query about juror attitudes concerning forensic evidence do not rise to an error clearly capable of producing an unjust result. R. 2:10-2.

## IV.

We now turn our attention to two of defendant's arguments that have relatively greater merit: specifically, (a) his challenge to the lay opinion testimony by the police detectives identifying him as the culprit in the surveillance video, and (b) the court's improper issuance of a flight charge. As we will discuss, those arguments prove to be inconsequential under principles of harmless error.

16

A.

Defendant argues it was improper for Detectives Long, Peterson, and Wolverton to testify that they believed he was the culprit shown on the surveillance video. He stresses that none of the detectives was present at the dealership during the robbery, thus they lacked personal knowledge under Evidence Rule 701 that would enable them to present their lay opinions of identification to the jurors.

The guiding principles on this issue have been elaborated in a series of decisions by the Supreme Court, starting with State v. McLean, 205 N.J. 438 (2011), and culminating most recently with State v. Watson, 254 N.J. 558 (2023), decided a few months ago.[3] In McLean, the Court made clear that to be admitted under Evidence Rule 701, lay opinion testimony by police officers must be based

---

[3] See also Allen, 254 N.J. at 543-49, (involving testimony that the defendant's photo had been included in an identification array because the testifying detective thought defendant closely resembled the culprit); State v. Higgs, 253 N.J. 333, 363-67 (2023) (involving police testimony that dashcam video depicted a gun-shaped bulge in the defendant's waistband); State v. Singh, 245 N.J. 1, 12-20 (2021) (involving police testimony that sneakers observed in video were similar to those the officer observed the defendant wearing when arrested); State v. Sanchez, 247 N.J. 450, 464-77 (2021) (involving parole officer testimony that a person in a surveillance photo was the defendant, a former parolee under the testifying officer's supervision); and State v. Lazo, 209 N.J. 9, 17-28 (involving police testimony that a prior arrest photo of the defendant closely resembled a composite sketch).

(1) on the officers' firsthand perceptions, and (2) must be helpful to the jury while not unduly prejudicial to a defendant. Id. at 456. Because the non-expert opinions of a testifying officer in McLean about whether the events at issue were indicative of a drug transaction did not satisfy those requirements, the Court declared them inadmissible. Id. at 463.

In its most recent guidance concerning these lay opinion issues in Watson,[4] the Court ruled that law enforcement officers who were not present when the crime occurred generally were not permitted to offer the jury their subjective opinions about the contents of surveillance videos that recorded the criminal acts. 254 N.J. at 608. Nor could such officers lacking personal knowledge of the actual events "narrate" the videos in a manner that opined about disputed facts depicted on the videos. Id. at 603-05. Hence, a police detective who was not present during a bank robbery in Watson violated these limitations— specifically by opining to the jury that the robber shown on the video was "being careful" not to leave fingerprints behind, and by expressing his interpretation of

---

[4] At oral argument on appeal, defendant's counsel stated that the Court's separate announcement of new procedures in Watson regulating first-in-time-in-court-identifications, such as the identification spontaneously made by Armitage in court, was not applicable to this case, which was tried before the opinion in Watson was issued. We therefore do not comment on the issue.

the factually disputed placement of the robber's fingers on a note that he displayed to the bank teller.  Id. at 607-08.

Applying these lay opinion restrictions here, we agree with defendant that it was improper for the three detectives to testify that, in their opinion, the culprit shown in the surveillance video looked like him.  None of the detectives were present when the robbery occurred.  They were not personally familiar with defendant.  They only had a chance to observe defendant (shaved and without eyeglasses) at a later time when he was located at the residence and apprehended.

Unlike the parole officer in Sanchez, 247 N.J. at 461, who recognized the defendant from previously meeting him in person about thirty times over a period of fifteen months, the detectives here were not acquainted with defendant until his arrest.  Moreover, as Detective Wolverton himself stated, the surveillance video in this case was of exceptional quality, which is why he did not show the video or photos from it to the eyewitnesses.  The jurors had no need to hear the officers' opinions about what they could see for themselves on the video.  The court erred in admitting the officers' opinions.

That said, we are unpersuaded that the admission of the officers' lay opinion testimony requires a new trial.  The error was harmless given the

19

surveillance video itself, the corresponding descriptions by Armitage and Dinatale about what happened at the crime scene, the admissions of guilt by defendant at his residence and in his formal interrogation at the police station, and the discovery of the discarded bag of BB guns hidden under a bush where defendant said he had left them. The compelling nature of this other incriminating evidence rendered the improvident admission of the officers' lay opinions harmless. Allen, 254 N.J. at 550 (holding that the "compelling" nature of the State's evidence overcame the trial court's error in admitting an officer's lay opinion testimony about of what was depicted on a surveillance video of the shooting events).

B.

The trial court also erred in issuing a flight instruction to the jury. Because the charge was not objected to by defendant at trial, we review this issue for plain error. State v. Walker, 203 N.J. 73, 89-90 (2010).

A jury instruction on flight may be given where "circumstances present and unexplained . . . reasonably justify an inference that [flight] was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based

20

on that guilt." State v. Mann, 132 N.J. 410, 418-19 (1993) (quoting State v. Sullivan, 43 N.J. 209, 238-39 (1964)).

Defendant argues on appeal that the flight charge was improperly given because the issue of the robber's flight was never contested. Defendant concedes that the culprit fled the scene in the Lexus; instead, he contests only the State's contention that he is the culprit. According to defendant, by issuing a flight charge, the trial court "distract[ed] the jury and risk[ed] conflation of issues that were disputed with those that were not."

There was no plain error here because the jury, despite hearing the flight charge, was well aware that defendant was contesting identity. The trial court instructed the jury as such: "[f]or you to find the defendant guilty the [S]tate must prove beyond a reasonable doubt that this person is the person who committed the crimes." The State contends the flight charge did not distract the jury from its primary task of determining defendant's guilt.

Here, the flight instruction was not clearly capable of producing an unjust result. The flight charge did not distract the jury from its primary task of determining defendant's guilt. As is evident from a reading of the entire jury instructions and from defendant's testimony, the jury was well aware that identity was the main issue in this case. The fact that the individual in the

surveillance video fled the scene does not contradict the issue of identity. Defendant has presented no convincing arguments that, by reading the flight charge to the jury, the court somehow conflated this issue with the core disputed issue of identity. The error in giving the charge was harmless.

V.

We have duly considered all other points and sub-points raised by defendant and conclude they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION